IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x

PHILLIP J. LAVEZZO :

d/b/a DKO TECHNOLOGIES, :

Plaintiff, : No. 05-575C

vs. : (Judge Wheeler)

THE UNITED STATES, :

Defendant. : PAGES 1 - 63

- - - - - - - - - - - - - - - - - - x

May 17, 2006

Washington, D.C.

Deposition of PHILLIP J. LAVEZZO, held at the United States Department of Justice, 1100 L Street, Northwest, Washington, D.C., commencing at 10:13 a.m., Wednesday, May 17, 2006, before Elizabeth Mingione, Notary Public.

college degree?
A. I have two years of college education and I attended graduate school at Department of Agriculture.
Q. Okay. What classes did you take at the Department of Agriculture graduate school?
A. The classes were landscape design.
Q. Do you have -- you haven't had any legal education?
A. No.
Q. And what college did you have your two years of --
A. Northern Virginia Community College.
Q. Okay. I'd like to talk about your employment history, I guess since you graduated from high school.
A. Numerous waiting tables. I can't recall every job that I've had, but --
Q. Well, let's start then in 2000. Where have you been employed?
A. 2000, I have numerous companies that I run.
Q. Okay.
A. One is Ashwood Lawn Care, which I was the sole proprietor of Ashwood Lawn Care. I'm involved

with an antique company. It's called Mahjongg. It's a antique company, Mahjongg.

And since 2000, I may have waited on tables during the wintertime. That's -- I've been currently employed with Ashwood Lawn Care full time.

Q. And, I'm sorry, you said that you were the sole proprietor of Ashwood?

A. I'm the president of the company.

Q. Do you have an ownership interest?

A. I'm the owner of the company.

Q. Okay. And then also you are the owner of DKO Technologies?

A. Yes. I probably should have included that one, but I figured it was understanding, understandable that I --

Q. That's fine.

A. Okay.

Q. Just for the record. Do you know, well, do you know a gentleman named Gary Crawford?

A. Yes.

Q. When did you first meet Mr. Crawford?

A. I have known Gary Crawford for roughly 12, 13 years.

Q. Okay. And how did you meet Mr. Crawford?

A. I believe it was maybe at a waitering

job. I think I waited on tables. I had met him through there, maybe a bar. It was in public somewhere in a bar or maybe waiting on tables. I don't recall exactly.

Q. Do you recall which bar or restaurant this was?

A. No. I don't recall.

Q. How frequently did you have contact with Mr. Crawford over that 13-year period on average?

A. Maybe -- when we first met, we met as friends, then it kind of tapered off. I went my way and he went his way, and maybe once a month, once every two months. Maybe there were periods of time maybe once every three months.

Q. Okay.

A. Six months. I don't know exactly.

Q. Around the time that the FLRA solicited for the contracts at issue in this litigation how often were you in communication with Mr. Crawford then?

A. Not very often, maybe once six months.

Q. Okay.

A. Before the contract you are talking about.

Q. Before the contracts. Yeah.

Q. Okay.

A. Knowing that the contract -- knowing that he had done the forum, he was known, well-liked. The forum went well. They asked him to come back. They praised his work.

He has a Ph.D. He is well-known in the community. He's a very nice, thoughtful man, very educated. I decided since his foot was already in the door and they knew of him, they knew him, I would start the company but I would do it through Dr. Ourecky being the public figure.

Q. Okay. Did DKO have any previous contracts either with the government or outside the government before this solicitation?

A. No.

Q. What were your responsibilities at DKO?

A. My responsibilities as being president were unlimited.

Q. Okay. What were your day-to-day -- strike that.

What was your day-to-day involvement with DKO Technologies?

A. Unlimited.

Q. Can you give me an example of some of the things you did for DKO Technologies?

A. I prepared documents. Excuse me. I prepared drafts for documents to be prepared. I handle all of the money aspects, all of the billing aspects, all of the bidding aspects. I did all the aspects of DKO Technologies of what it took to run the company.

Q. Okay. And what were Mr. Ourecky's day-to-day responsibilities with DKO Technologies?

A. Mr. Ourecky's responsibilities were when needed, was when needed was to do communications with FLRA and through the government contracts, on occasion do interviewing, write checks, which he very seldomly did. I did all of that. But he was capable -- I gave him full capability of doing whatever I did.

Q. Okay.

A. Nevertheless, I being the businessman aspect of it, him being the knowledge of life and the public figure, the business aspect of it was through me.

Q. Okay.

A. By me through Donald Ourecky. He was my Ph.D. He was my public figure. So his job was to interview, to send documents that I had prepared, and to communicate with any FLRA needs through my

\- - -

(Whereupon the following portion of the testimony was repeated by the Court Reporter:

"QUESTION: Did you ever execute a legal power of attorney or a legal document delegating authority to Mr. Ourecky to operate business upon your behalf?")

\- - -

A. A document? There may be a document at the bank when I opened a checking -- a savings checking account with DKO as far as me being the president, sole proprietor. I may have given him authorization to sign checks. So that would be a document saying that he is authorized to sign checks.

Q. Okay. But other than that you don't recall any other documentation?

A. No.

Q. Okay.

A. I am sorry. There could be, when I got the satellite company, satellite office space, when I would put my name down as far as me wanting to lease space, I may have put his name down as vice president. Or I may have put his name down where he can use the office space as well.

Q. Okay.
A. So that may be another document.
Q. Okay. I'm going to ask you some questions, Mr. Lavezzo. And one of the concerns when a company -- when there is a ownership interest by a person who's not readily identified is that there is a restriction, that there's a reason that you couldn't obtain the contract in your own name.
And I'd like to ask you, have you ever been arrested?
A. Yes.
Q. Could you tell me when?
A. Is that relevant to this? For a DUI.
Q. Okay. When was that?
A. That was in -- that was about six years ago.
Q. Okay.
A. And nothing since.
Q. Okay.
A. Poor judgment. Learned my lesson.
Q. I am not really interested.
A. Well, you rolled your eyes, so I was wondering why that was. I don't understand why. Never mind. I just noticed that you rolled your eyes, like, okay.

send payment electronically. They had asked Donald Ourecky if they could send payments. Instead of checks, I was getting a check electronically. I told Don tell them yes.

They asked for a social security number. I provided my personal social security number which states me. And it states that I, that DKO is a sole proprietorship because I would have given them a federal ID number if it had not been.

Q. And did this document just contain your social security number or did it state that it was the social security number of Phillip Lavezzo?

A. It stated the social security number in which I wanted the -- they needed it to send the electronic mail. I don't think that my name --

Q. Okay.

A. At this point I didn't think my name was an issue because Donald was my agent. He was dealing directly with the FLRA.

Q. Okay. During the performance of these two contracts, how often did you communicate with Gary Crawford?

A. Do you still need this? Do I still need this?

Q. No. You can leave it there.

Q. Did you have any communications with Gary Crawford after this invoice was submitted asking why it hadn't been paid?
A. I don't recall.
Q. Okay. After the claim was, well, after you received documents indicating that the claim had been transferred to the Bureau of Public Debt, did you have any communications with the Bureau of Public Debt?
A. No.
Q. Okay. Did you ever tell the Bureau of Public Debt that you had a final -- had received -- already received a final decision?
A. I had no communication with the Bureau of Public Debt.
Q. Okay.
A. And, well, there was a reason why is because Yvonne Thomas states that it had been reassigned to the Bureau of Public Debt. And I didn't get a -- very first letter I got, I didn't get contact information. I didn't know who she was. I didn't know where to go.
Q. Okay.
A. And I didn't get any information from her. I believe that one of the letters that I

Q. Well, first I was going to ask you do you recognize this document?
A. Okay. This one right here?
Q. Yeah.
A. Have I -- I'm sorry. It's been a long time since I've looked at -- it's been a very long time and a very busy year. Okay.
Q. My first question was just if you recognized the document?
A. Yes. I do recognize the document.
Q. And you saw this document shortly after it arrived on sometime around February of 2005?
A. Yes.
Q. Okay. And the language that I read before, it's the third paragraph of the letter, asked offering that if DKO wished to submit additional information, they would consider it. And my question was just you previously said you had no contact with the Bureau of Public Debt?
A. That's right.
Q. Why didn't you send them a copy of this final decision from Gary Crawford saying we already had a final decision?
A. Well, I didn't know who these people were. I believe when I got this letter what I was

thinking is from all of this that's going on with Yvonne Thomas, maybe I don't know what I was thinking, but I was thinking that what the government was trying to do was to send it away to get the answer that they were looking for, which is to deny me, which I think is I'm -- that is what they did. They sent it to another person to deny me. That's what I was thinking.

I didn't know what to think at that point. I'm sorry. I didn't know what to think. But I believe that when I received this letter that the deadline had been up anyway, so I just kind of threw this in the trash.

Because it says December 20. And I believe the deadline was a week before that, the deadline of the final decision. Even though I received Gary Crawford's already, this final decision is out in West Virginia. To me it was garbage because it had been over the time limit. So I just kind of dismissed it.

Q. Okay.

A. I was confused. I was confused because they were trying to reassign it, and I had been waiting for it, and then I got it and then they were trying to reassign it. And then when they did, they

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

PHILLIP J. LAVEZZO :

d/b/a DKO TECHNOLOGIES, :

Plaintiff, : No. 05-575C

vs. : (Judge Wheeler)

THE UNITED STATES, :

Defendant. : PAGES 1 - 26

- - - - - - - - - - - - - - - - - x

May 17, 2006

Washington, D.C.

Deposition of DONALD K. OURECKY, held at the United States Department of Justice, 1100 L Street, Northwest, Washington, D.C., commencing at 12:05 p.m., Wednesday, May 17, 2006, before Elizabeth Mingione, Notary Public.

I'll try to let your finish your answers. If you can, please try to let me finish my question before answering. If we are both talking at the same time, it makes it very difficult for the court reporter to make a clear record.

Is there any reason you can't testify truthfully today, you are on any medication that might interfere with you?

A. No.

Q. Okay. If you need a break at any time, just let me know. I'd just ask that you not request a break while a question is pending. For the record, could you please state your name and address?

A. I'm Dr. Donald K. Ourecky and I live at 2012 Rollins Drive in Alexandria.

Q. Okay. And are you represented by counsel here today?

A. Yes, my attorney.

Q. By Mr. Knasel. Okay. You indicated you are Dr. Ourecky. So I assume you have a college degree and then some. Could you give me your educational background?

A. Well, I have a BS from Oregon State, an MS and Ph.D. from Washington State University. I am

a professor at Cornell University, now retired.

During that time I was basically doing some teaching and some research, mainly research. But over the course of that time I probably authored 120 articles, papers, chapters in books, pamphlets, all that sort of thing.

Q. Okay.

A. That's sort of my background, unless you want to ask a question about what I did at Cornell.

Q. Well, I was going to ask you what your degrees were issued in, what subject?

A. Genetics and horticulture.

Q. Okay. So is it bachelor of science in --

A. At Oregon State.

Q. In genetics?

A. Basically it was horticulture, because that's a BS degree.

Q. Okay.

A. For my Ph.D., I went on to do more with genetics. And my minor would have been horticulture.

Q. Okay. Could you give me a brief summary of your employment since you graduated from college?

A. Since I graduated from college.

Q. Full-time positions?

A. Full-time position would be professorial at Cornell University.
Q. Okay.
A. Which I was living in Geneva, which is the research center, teaching down at Ithaca. After that, I did some real estate. I sort of retired from Cornell.
And I thought, well, I'll just take my antique business. I had antiques since the year 1, it seems like. Maybe I'll do something different, retire, change of pace. So I took my antique business to Florida. I was there roughly 20 years, I guess. While I was there, decided to make a little more money than antiques, so I did some real estate.
Q. Okay. So after Cornell you didn't have any professorial employment?
A. No.
Q. You were doing the antiques and real estate?
A. Basically. Yeah.
Q. Okay. And after your antique business in Florida, then what?
A. After my antique business in Florida, I sort of, well, I was continuing with my real estate.

And while I was in Florida, I met Phillip. And he has a landscape business. My whole background is horticulture.

Q. Okay.

A. And the idea that he liked plants and all that kind of stuff, and I did, and he says, you know, you are going to continue doing real estate. And I said, I don't know. Would you like to help out in the landscape business. And I said, Gee, that sounds interesting, a change of pace.

So I decided to come up north. And it's been super because Washington is a trove of antiques. It's a good source for me to find things, to find what I want, whereas before it was difficult.

Q. Um-hmm.

A. And help Phil with landscaping. And that's about it.

Q. Okay. And what is your background in computer programming or computer --

A. Very limited.

Q. Okay. For the record, the address you gave on Rollins Avenue is that your home address or is that the DKO business address or both?

A. Home address.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - x

PHILLIP J. LAVEZZO, :

d/b/a DKO TECHNOLOGIES, :

Plaintiff, : No. 05-575C

v. :

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - - - - x

Washington, D.C.

Wednesday, May 24, 2006

Deposition of DAVID M. SMITH, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the District of Columbia, taken at the offices of Federal Labor Relations Authority, 1400 K Street, N.W., Washington, D.C., at 2:10 p.m., Wednesday, May 24, 2006, and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and transcribed under her direction.

A. I have no recollection of having done so, but I could have.

Q. Did you discuss with Yvonne Thomas instructions for Gary Crawford on handling contract matters?

A. Yes.

Q. And what did you discuss with Yvonne Thomas?

A. Well, we would have had numerous discussions concerning contract matters in general and Gary Crawford in particular. If you can be a little more specific, maybe I can help.

Q. Sure. Did you discuss requiring Gary Crawford to notify either Yvonne Thomas or you immediately in the event of any claims by contractors and taking no action on such claims?

A. Yes.

Q. And what did you discuss about that?

A. The general tenor of our discussions were that when a claim was filed by a contractor, we wanted to know about it. She as the first line supervisor, I as the second line supervisor and before the contracting officer did anything, we wanted step one for them to notify her and in her absence to notify me. That was the nature of it.

Q. And why did you want to be notified?

A. Well, if the claim was against the agency and we were the supervisory personnel in charge, we wanted to know that a claim had been filed for some dispute of a contract.

Q. Why did you also instruct Gary Crawford not to take any action until receiving further directions from either you or Yvonne Thomas?

A. We didn't want him or anyone else to do anything until such time as we were aware of a claim being made and able to at least see what the basis for the claim was.

Q. Why would you need to see what the basis of the claim was?

A. Well, as I stated to you earlier the claims are against the agency, and the agency is the one that stands liable for paying off the claimant. We didn't want our contracting officers to take any action until such time as we were aware of what the nature of the claim was.

Q. Once you were made aware of the claim and the nature of the claim, why couldn't the contracting officer continue to handle the claim without receiving further instructions?

A. Perhaps they could. I don't know that we

ever faced the situation where Mr. Crawford came to me and said I received this claim, what do you want me to do, or anything like that. I don't recall something like that happening. What we are looking for in this is notification to agency officials that we received a claim. That's what we were looking to. The next steps would have been determined after that.

Q. Did DKO ever file any claims against FLRA?

A. Is DKO the same person that's the plaintiff in this litigation?

Q. Yes.

A. Yes. They did.

Q. Do you recall when those claims were submitted?

A. My recollection is the claims came in either the end of 2004 or the beginning of 2005.

Q. When did you first learn of the claims?

A. Several weeks after they were actually filed.

Q. How did you first learn of them?

A. My recollection is Miss Thomas informed me that Mr. Crawford had informed her the claims had been filed.

Q. What did you do upon learning of the

to that time?

A. I did not.

Q. Do you know if anyone else in the FLRA had received this document prior to the litigation that you referred to?

A. If they did, they did not convey it to me so -- again, I don't know what someone else could have received.

Q. And going back to Exhibit 9, do you know if you ever received that document?

A. No. I did not receive proposed COFD.

Q. Do you know if anyone else in the FLRA ever received that document?

A. I do not. Although if they did, they never conveyed it to me.

Q. Were the DKO claims referred to the Bureau of Public Debt?

A. Yes.

Q. Why was that done?

A. We were not willing to let Mr. Crawford handle this matter because of his history and because of the way he dealt with the claim when it was filed by DKO.

Q. What do you mean by his history?

A. Well, I've already relayed to you it could

be the history involving some other matters. And the DKO claim was filed, we had given him instruction as you already noted to inform us about it immediately, take no action. He did not do so when the claim was filed. He delayed for a period of several weeks, two to three as I recall, informing Miss Thomas that DKO had in fact filed a claim.

Q. Is there any other history that you haven't already described that was relevant to that decision?

A. I'm sure there is. Mr. Crawford had by that time engaged in behavior that caused me to question his neutrality and his ability to fairly adjudicate the claim. I might not be able to recall every incident here today.

Q. Well, can you give me those examples that you can recall?

A. I recall a conversation he had with a person when I was not in the room where he referred to the Cicatrix claim stating that he felt they had not been treated as fairly as they should have been. If he had a chance, if they ever filed a claim, he would try to get the agency, get the FLRA -- I think that was Cicatrix, but I'm not certain. But to hear comments like that from a contracting officer was

alarming and would make me think very carefully before I would allow them to adjudicate a claim. There may have been others.

Q. What happened after the DKO claims were transferred to the Bureau of Public Debt?

A. The -- I don't have a specific recollection. I know the claims ultimately did not result by review of the public debt people. I'm not familiar with exactly what went on between the claimant and the contracting officer but the bureau probably denied the claims. Once we transferred the claims, we took no action in either the Cicatrix or DKO claim, either the adjudication of it or the merits. We totally turned that over to Public Debt.

Q. Did the Bureau of Public Debt issue a decision?

A. My recollection is they did.

Q. Were you aware that Gary Crawford had already issued a decision at that time?

A. I was not.

MR. D'ALESSANDRIS: Objection. Assumes facts not in evidence.

BY MR. KNASEL:

Q. Did you ever become aware that Gary Crawford had issued a decision?

A. I became aware when I saw the litigation that came into the Office of the Solicitor in the spring or summer of 2005 that there was a purported decision attached to the claim and that's Exhibit 10. That's the first time I became aware of anything like that.

Q. And just so we are clear, the litigation you're referring to is DKO Technologies vs. The United States in the Court of Federal Claims?

A. That's my recollection. They filed an action seeking payment of the amount of money that Mr. Crawford had purportedly awarded them.

Q. Please take a look at what was previously marked as Exhibit 16. And in particular, the e-mail that appears on the bottom of the first page and the top of the second page. Do you recall ever seeing this e-mail?

A. The answer is yes but I'm not certain that all of the two pages of this e-mail were configured as they are when I saw them. I remember Mr. Crawford, the part that you referred me to, Mr. Crawford wrote an e-mail to Yvonne Thomas and this appears to be the substance of what he wrote.

And I remember that she sent him back and cc'd me, the guidance at the top. I don't have a

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - X

PHILLIP J. LAVEZZO, :

d/b/a DKO TECHNOLOGIES, :

Plaintiff, : No. 05-575C

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - X

Washington, D.C.

Wednesday, May 24, 2006

Deposition of YVONNE THOMAS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the District of Columbia, taken at the offices of Federal Labor Relations Authority, 1400 K Street, N.W., Washington, D.C., at 10:05 a.m., Wednesday, May 24, 2006, and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and transcribed under her direction.

A. Gary did not notify anyone that he had received the claim until some period after he received it.

Q. And so why does that mean that it should be referred to the Bureau of Public Debt?

A. Gary at that time, I had asked from Gary that he not do anything with any claims without notifying me first or David Smith. Gary did not do this in this case.

Q. And you believe that his failure to notify you immediately warranted transferring the claim to the Bureau of Public Debt?

A. I believe that at that time Gary was, was not -- he would not have handled the claim in a fair and equitable manner.

Q. And what did you base that belief on?

A. Because of prior actions when I had asked Gary to do things, he did not follow through. He just, he wasn't doing what he was requested to do.

Q. Do you know if Gary Crawford submitted a complaint to the Inspector General regarding the Cicatrix matter?

A. I believe he did.

Q. And did you ever receive a copy of the Inspector General's report in that matter?

record for a minute.

(Discussion off the record.)

BY MR. KNASEL:

Q. Ms. Thomas, the court reporter has handed you what's been marked as Exhibit 3, which appears to be a memorandum dated March 24, 2004 from you to Gary Crawford and Steven Smith, and it bears Bates stamp number GOV-00096.

Can you identify this document for me, please?

A. Yes. This is a memo that I sent to Gary and to Steven.

Q. Is that your signature that appears next to your name?

A. Yes.

Q. And when you testified earlier that you had ordered Gary Crawford not to take any actions on contractor claims aside from notifying you or David Smith, is this the instruction contained in this memo? Is that what you were referring to?

A. One of the instructions. I had given other instructions in writing.

Q. And what were those other instructions that you gave?

A. I believe I gave Gary at least one more

Q. Do you know if they were faxed to him from DKO?
A. That's what he told me, they were faxed.
Q. And the documents that you received from Gary Crawford, were those claims by DKO Technologies?
A. Yes.
Q. And when did you first learn of those claims?
A. On January 10th, 2005.
Q. You hadn't learned of the claims before then?
A. No.
(Thomas Exhibit No. 8 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you a one-page document marked as Exhibit 8, a memorandum dated December 30th, 2004 bearing Bates stamp number P 0180. Did you receive this memorandum from Gary Crawford?
A. No.
Q. Have you ever seen this document before?
A. No.
(Thomas Exhibit No. 9 was marked for identification.)

contracts for us.

Q. In order for BPD to adjudicate the DKO claims, was it necessary to modify the agreement?

A. Yes.

Q. Between the FLRA and BPD?

A. Yes.

Q. Could you mark that as the next exhibit, please.

(Thomas Exhibit No. 13 was marked for identification.)

BY MR. KNASEL:

Q. The court reporter has handed you a document that's been marked as Exhibit 13 bearing Bates stamp number GOV-03974 and containing an e-mail from Yvonne Thomas to David Smith dated January 13th, 2005 regarding BPD agreement. Did you send that e-mail to David Smith?

A. Yes.

Q. And the first sentence where it says BPD is going to modify the agreement showing that we are using $10,000 for CO services for the claim. Is that referring to the modification that you just testified about?

A. Yes.

Q. And the claim refers to the DKO

Technologies claims?
A. Yes.
Q. And then do you see where the e-mail continues: Therefore the only thing I need to send them is an e-mail indicating that they should move forward with the modification. I plan to do that within the next 10 minutes and will send the package off to them tonight. Do you see that?
A. Yes.
Q. Did you send an e-mail to that effect to BPD?
A. Yes.
Q. And in the last sentence, what does the package refer to?
A. Copies of the contract file.
Q. And did you send that to BPD?
A. Yes.
Q. Do you know when BPD received that?
A. The next day.
(Thomas Exhibit No. 14 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you a document marked as Exhibit 14 entitled Reimbursable Services Agreement bearing Bates stamp numbers

CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2006, a copy of the forgoing "DEFENDANT'S APPENDIX IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David D'Alessandris