IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 05-575C
(Judge Wheeler)

PHILLIP J. LAVEZZO
d/b/a DKO TECHNOLOGIES,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

PLAINTIFF'S APPENDIX IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT AND
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVID M. KNASEL
CLARK & COLLINS, P.C.
Market Station
108-E South Street, S.E.
Leesburg, Virginia 20175

Telephone: (703) 443-1083
Facsimile: (703) 443-1081

Attorney for Plaintiff

August 8, 2006

INDEX TO APPENDIX

| Tab # | Description of Item |
|---|---|
| 1 | Defendant's Response to Plaintiff's First Request for Admissions |
| 2 | Deposition of Yvonne Thomas (selected pages and exhibits) |
| 3 | Deposition of David Smith (selected pages) |
| 4 | Deposition of Francine Eichler (selected pages) |
| 5 | Declaration of Gary Crawford (with selected attachments) |

# TAB 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PHILLIP J. LAVEZZO<br>d/b/a DKO TECHNOLOGIES,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 05-575C<br>(Judge Wheeler) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS**

Pursuant to Rule 36 of the Rules of the United States Court of Federal Claims, defendant responds as follows to plaintiff's First Request For Admissions, served by plaintiff on April 21, 2006:

1. In December of 2004, Thelma Brown was an employee of FLRA.

**Response:** Admits.

2. In December of 2004, Thelma Brown was a Notary Public.

**Response:** Admits.

3. On December 30, 2004, Thelma Brown notarized and signed a document entitled in part "Proposed C.O.F.D." (the "Proposed COFD").

**Response:** Admits.

4. A true and correct copy of the Proposed COFD that was notarized and signed by Thelma Brown on December 30, 2004, was produced in discovery by Plaintiff, bearing document control numbers P-0016 through P-0136.

**Response:** Admits that a true and correct copy of the document was produced by plaintiff, bearing document control numbers P-0116 through P-0136.

5. Gary W. Crawford signed and dated the Proposed COFD before Thelma Brown on December 30, 2004.

**Response:** Admits.

6. In January of 2005, Mary Prothro was an employee of the U.S. Government.

**Response:** Admits.

7. In January of 2005, Mary Prothro was a Notary Public.

**Response:** Admits.

8. On January 13, 2005, Mary Prothro notarized and signed a document entitled in part "In the Dispute Pursuant to 41 U.S.C. § 605(a) Involving: DKO Technologies" (the "COFD").

**Response:** Admits that on January 13, 2005, Mary Prothro notarized Gary Crawford's signature. Further admits that Ms. Prothro's signature is currently located upon an unnumbered page, following page 17 of a document entitled "In the Dispute Pursuant to 41 U.S.C. § 605(a) Involving: DKO Technologies."

9. A true and correct copy of the COFD that was notarized and signed by Mary Prothro on January 13, 2005, was attached as Exhibit B to Plaintiff's Complaint in this action.

**Response:** Having made a reasonable inquiry, defendant has been unable to locate a copy of the purported COFD in the files of the Federal Labor Relations Authority. Accordingly, defendant is unable to admit that the document attached to plaintiff's complaint is a true and correct copy of the document notarized by Ms. Prothro on January 13, 2005.

10. Gary W. Crawford signed the COFD before Mary Prothro on January 13, 2005.

**Response:** Admits that Mary Prothro notarized the signature of Gary W. Crawford on January 13, 2005, and that Ms. Prothro's notarization is currently contained in a document

entitled "In the Dispute Pursuant to 41 U.S.C. § 605(a) Involving: DKO Technologies" but is unable to admit that the document was signed on January 13, 2005, as the document has not been located in the contract files of the FLRA.

11. A document entitled "Statement of Account" and dated February 1, 2005 (the "Invoice"), was submitted to FLRA.

**Response:** Defendant denies the requested admission for lack of knowledge. Having made a reasonable inquiry, defendant has been unable to locate a copy of the "Statement of Account" in the FLRA contracting files.

12. A true and correct copy of the Invoice that was submitted to FLRA was produced in discovery by Plaintiff, bearing document control number P-0015.

**Response:** Defendant denies the requested admission for lack of knowledge. Defendant has been unable to locate a copy of the "Statement of Account" in the FLRA contracting files.

13. The copy of the Invoice bearing document control number P-0015 contains a date stamp from the FLRA Mail Distribution Center dated February 1, 2005.

**Response:** Defendant denies the requested admission for lack of knowledge. Defendant has been unable to locate a copy of the "Statement of Account" in the FLRA contracting files. Accordingly, defendant is unable to confirm whether the date stamp was from the FLRA mail distribution center.

14. The Invoice was received by FLRA on February 1, 2005.

**Response:** Defendant denies the requested admission for lack of knowledge. Defendant has been unable to locate a copy of the "Statement of Account" in the FLRA contracting files.

15. In February of 2005, Stephen G. Smith was an employee of FLRA, Administrative Services Division.

**Response:** Admits.

16. In February of 2005, Stephen G. Smith had access to the FLRA's mail room.

**Response:** Admits.

17. Prior to August 25, 2005, Stephen G. Smith was never interviewed by FLRA management concerning receipt of the Invoice.

**Response:** Admits.

18. Stephen G. Smith never stated to FLRA management that he did not receive a hand-delivered invoice from Donald Ourecky or Plaintiff.

**Response:** Admits.

19. The document bearing document control number P-0089 that was produced in discovery by Plaintiff is a true and correct copy of an e-mail sent by Stephen G. Smith to Donald Ourecky on September 6, 2005.

**Response:** Admits.

20. In February of 2005, Darryl Gould was an employee of FLRA, Administrative Services Division.

**Response:** Admits.

21. In February of 2005, Darryl Gould had access to the FLRA's mail room.

**Response:** Admits.

22. Prior to August 25, 2005, Darryl Gould was never interviewed by FLRA management concerning receipt of the Invoice.

**Response:** Admits.

23. Darryl Gould never stated to FLRA management that he did not receive a hand-delivered invoice from Donald Ourecky or Plaintiff.

**Response:** Admits.

24. In February of 2005, Nicole Hollis was an employee of FLRA, Administrative Services Division.

**Response:** Admits.

25. In February of 2005, Nicole Hollis had access to the FLRA's mail room.

**Response:** Admits.

26. Nicole Hollis told FLRA management that she did not remember seeing the Invoice.

**Response:** Admits.

27. Nicole Hollis never stated unequivocally to FLRA management that she did not receive a hand-delivered invoice from Donald Ourecky or Plaintiff.

**Response:** Admits.

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

FRANKLIN E. WHITE, JR.
Assistant Director

David D'Ale

DAVID D'ALESSANDRIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L. Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone:(202) 307-0139
Facsimile (202) 514-8624

May 22, 2006

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this ~~8th~~ 22nd day of May 2006, I caused to be served by first class mail, postage prepaid, copies of DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST REQUEST FOR ADMISSIONS addressed as follows:

DAVID M. KNASEL
Clark & Collins, P.C.
Market Station
108-E South Street, S.E.
Leesburg, VA 20175

Rosa M. Robinson

# TAB 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - X

PHILLIP J. LAVEZZO, :
d/b/a DKO TECHNOLOGIES, :
Plaintiff, : No. 05-575C
v. :
THE UNITED STATES, :
Defendant. :

\- - - - - - - - - - - - - - - X

Washington, D.C.

Wednesday, May 24, 2006

Deposition of YVONNE THOMAS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the District of Columbia, taken at the offices of Federal Labor Relations Authority, 1400 K Street, N.W., Washington, D.C., at 10:05 a.m., Wednesday, May 24, 2006, and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiff:
DAVID M. KNASEL, ESQ.
MICHAEL R. ABEJUELA, ESQ.
Clark & Knasel, P.C.
Market Square
108-E South Street, S.E.
Leesburg, VA 20175
(703) 443-1083

On behalf of the Defendant:
DAVID D'ALESSANDRIS, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Room 12002
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-1011

ALSO PRESENT:
DAVID SHEWCHUK, ESQ., FLRA
WILLIAM TOBEY, ESQ., FLRA
PHILLIP J. LAVEZZO, President, DKO TECH



CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| YVONNE THOMAS | PLAINTIFF |
| By Mr. Knasel | 6 |


EXHIBITS


| THOMAS EXHIBIT | | PAGE NO. |
|---|---|---|
| No. 1 | Position description for Contract Specialist, GS-1102-14 Bates numbers P 0029 - P 0031 | 13 |
| No. 2 | Federal Labor Relations Authority performance appraisal cover sheet, etc. Bates P 0080 - P 0085 | 14 |
| No. 3 | Memorandum of March 24, 2004, Thomas to Crawford and Smith, Bates number GOV-00096. | 27 |
| No. 4 | 3/25/04 memorandum from Smith to Crawford, cc to Thomas, w attached certification of appointment, Bates GOV-03859 to GOV-03860 | 29 |
| No. 5 | Series of E-mails, Bates GOV-04943 to 03944 | 30 |
| No. 6 | Four page document; first page is letter dated 12/9/04 | 32 |




EXHIBITS (Continued)


| THOMAS EXHIBIT | | PAGE NO. |
|---|---|---|
| No. 7 | Four page document; first page is letter dated 12/9/04 | 32 |
| No. 8 | Memorandum dated 12/30/04 Bates P 0180 | 34 |
| No. 9 | Document with Bates nos. P 0182 - P 0202, includes Proposed COFD | 34 |
| No. 10 | P 0205 through P 0226, Contracting Officer's Decision | 36 |
| No. 11 | E-mail, one page, Bates GOV-04936 | 49 |
| No. 12 | Various e-mails, Bates GOV-04546 through GOV-04552 | 50 |
| No. 13 | Bates GOV-03974, contains e-mail from Thomas to Smith, 1/13/05 regarding BPD agreement | 55 |
| No. 14 | Reimbursable Services Agreement, Bates GOV-04597 - GOV-04602 | 56 |
| No. 15 | Letter of January 14th, 2005 bearing Bates stamp P 0009 | 57 |
| No. 16 | E-mails,Bates GOV-04535 - 36 | 59 |
| No. 17 | E-mail, 1 page, Bates P 0177 | 61 |
| No. 18 | Letter to Thomas from DKO Technologies, Bates P 0065 | 62 |




EXHIBITS (Continued)


| THOMAS EXHIBIT | | PAGE NO. |
|---|---|---|
| No. 19 | A one-page document with e-mails Bates GOV-04642 | 63 |
| No. 20 | E-mail string, Bates GOV-04481 through 04484 | 65 |
| No. 21 | Letter, 1/31/04, Thomas to Ourecky; Bates P-0067 | 69 |
| No. 22 | E-mail, DKOTECH to Thomas, cc to Eichler, 1/31/05, Bates P-0068 | 69 |
| No. 23 | DKO Technologies, Statement of Account, 2/1/05 - Bates P-0015 | 70 |
| NO. 24 | Memorandum, 2/8/05, Crawford to Thomas, Bates GOV-03885 | 71 |
| No. 25 | E-mail string, GOV-03882 - 83 | 72 |
| No. 26 | Memorandum, 4/26/05, Smith to Crawford, Subject: Termination of contracting officer warrant, Bates GOV-03861 | 75 |
| No. 27 | Defendant's Motion for an RCFC 56(f) Continuance to Obtain Necessary Discovery Upon Issues Raised by Plaintiff's Motion for Summary Judgment | 76 |

Page 6

PROCEEDINGS

Whereupon,

YVONNE THOMAS,

residing at 607 Academy Road, Baltimore, MD, was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. KNASEL:

Q. Good morning, Ms. Thomas. Could you please state your full name for the record.
A. Yvonne Marie Thomas.
Q. And what is your home address?
A. 607 Academy Road, Baltimore, Maryland, 21228.
Q. And if we could just go around the table and have people identify themselves for the record.
MR. D'ALESSANDRIS: I'm David Alessandris and I'm an attorney with the United States Department of Justice.
MR. SHEWCHUK: David Shewchuk, attorney for the Federal Labor Relations Authority.
MR. TOBEY: William Tobey, deputy solicitor, Federal Labor Relations Authority.
MR. LAVEZZO: Phillip Lavezzo,

Page 7

owner-president, DKO Technologies.
MR. ABEJUELA: Mike Abejuela, associate with Clark & Knasel.
MR. KNASEL: And I'm David Knasel of Clark and Knasel, counsel for the plaintiff in the matter of DKO Technologies -- strike that. Phillip J. Phillip J. Lavezzo, d/b/a DKO Technologies vs. The United States.

BY MR. KNASEL:

Q. Ms. Thomas, I'm going to ask you some questions. You're required to answer truthfully to the best of your ability. If I ask you a question that you don't understand, please let me know and I'll try to rephrase it.
In addition, I ask that you respond verbally with a yes or no or whatever words you choose to use for your answer rather than nods or uh-uhs or things like that. Is that okay?
A. Yes.
Q. Okay. How are you currently employed?
A. How am I currently employed. I don't understand.
Q. Where do you work?
A. Federal Labor Relations Authority.
Q. And what position do you have with the

Page 8

Federal Labor Relations Authority?
A. Director administrative services division.
Q. And how long have you held that position?
A. Since January of 2003.
Q. And before then, where were you employed?
A. Department of Health and Human Services.
Q. And what was your position there?
A. Director administrative services division.
Q. And how long did you hold that position?
A. For three years.
Q. Prior to that?
A. Department of Agriculture.
Q. And what was your position with the Department of Agriculture?
A. Administrative officer.
Q. And how long did have you that position?
A. 10 years.
Q. Have you ever had your deposition taken before?
A. No. I haven't.
Q. Have you ever testified in a court case of any kind?
A. Yes.
Q. What case was that?
A. When I was in the military, I was a

Page 9

paralegal many years ago. I don't remember.
Q. What type of case was it, if you recall?
A. I don't recall.
Q. What branch of the military were you in?
A. Air Force.
Q. And how long were you in the Air Force for?
A. Eight and a half years.
Q. And when did your time in the Air Force end?
A. 1980.
Q. And were you honorably discharged from the Air Force?
A. Yes.
Q. Can you describe your current responsibilities with the FLRA?
A. I manage the procurement and contract functions, the mail room functions, real property functions, and space and facilities function.
Q. When you say real estate function, what does that refer to?
A. Leasing of real property for our offices in the regions.
Q. And when you say management function, wha does that entail?

Page 22

A. They were paid a lesser amount than what the claim was for.
Q. Did you agree with Gary's final decision?
A. When you say did I agree with it --
Q. Did you think that the contractor should have been paid the amount that Gary found they should be paid?
A. Yes.
Q. Do you recall when the Cicatrix claim was submitted?
A. Summer '04.
Q. And who was that claim submitted to?
A. To Gary.
Q. And did Gary Crawford issue a final decision on that claim?
A. That claim was transferred to the Bureau of Public Debt.
Q. Did Gary Crawford recuse himself from that claim?
A. Yes.
Q. Why did he do that?
A. He was asked to recuse himself because the case was sent to the Bureau of Public Debt.
Q. Why was the case sent to the Bureau of Public Debt?

Page 23

A. Gary did not notify anyone that he had received the claim until some period after he received it.
Q. And so why does that mean that it should be referred to the Bureau of Public Debt?
A. Gary at that time, I had asked from Gary that he not do anything with any claims without notifying me first or David Smith. Gary did not do this in this case.
Q. And you believe that his failure to notify you immediately warranted transferring the claim to the Bureau of Public Debt?
A. I believe that at that time Gary was, was not -- he would not have handled the claim in a fair and equitable manner.
Q. And what did you base that belief on?
A. Because of prior actions when I had asked Gary to do things, he did not follow through. He just, he wasn't doing what he was requested to do.
Q. Do you know if Gary Crawford submitted a complaint to the Inspector General regarding the Cicatrix matter?
A. I believe he did.
Q. And did you ever receive a copy of the Inspector General's report in that matter?

Page 24

A. No. I didn't.
Q. Were you ever made aware of the results of the Inspector General's investigation?
A. I don't remember.
Q. Were you ever made aware of any recommendations by the Inspector General?
A. I don't remember.
Q. Did you ever take any actions to implement or respond to any recommendations by the Inspector General?
A. If I wasn't aware, I couldn't have responded.
Q. Are you familiar with DKO Technologies?
A. Yes.
Q. And what is that?
A. Company that was performing a contract for us. When I arrived up, until the period when the contract ended.
Q. And when did the contract end?
A. I don't recall exactly when it ended.
Q. DKO Technologies had two contracts with the FLRA, is that correct?
A. Yes. To my knowledge.
Q. And each of those contracts was extended beyond its initial term, is that correct?

Page 25

A. I don't remember all the details of that.
Q. Did the FLRA ever exercise any option periods on either of the contracts?
A. Not that I remember.
Q. Is, as part of your responsibilities as director of administrative services, do you have any responsibility for the maintenance of FLRA files and records?
A. Yes.
Q. Can you explain your responsibility in that regard?
A. For the maintenance of files and records?
Q. Yes?
A. I have an individual who, do you mean records like record keeping or records of -- of an individual who maintains the files and records for the agency who oversees that function.
Q. And does the FLRA have a file room?
A. FLRA has many file rooms.
Q. And do you have any file rooms that are within your area of responsibility?
A. Yes.
Q. Can you describe those file rooms.
A. I have one file room where administrative services keeps all its records.

Page 30

Q. And was this warrant in effect from the date it was issued, March 25th, 2004, until it was terminated around the time of Gary Crawford's retirement?
A. Yes.
Q. Could you mark that as Exhibit 5, please.
(Thomas Exhibit No. 5 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you what's been marked as Exhibit 5, which is a series of e-mails, two pages bearing Bates stamp numbers GOV-04943 to 03944. Could you take a moment to review these e-mails and tell me if you remember these e-mails?
A. Yes.
Q. Now directing your attention specifically to the bottom of the first page and the top of the second page, there appears to be an e-mail from Yvonne Thomas, you, to Gary Crawford on Wednesday, June 30th, 2004. Do you see that e-mail?
A. Yes.
Q. Did you send that e-mail to Gary Crawford?
A. Yes.
Q. And is that the additional instruction in

Page 31

writing that you were referring to a moment ago?
A. It is one of the instructions. I believe I also gave him one in the summer of 2004.
Q. June 30th, 2004, would you consider that to be the summer of 2004?
A. Yes.
Q. So you believe you gave him another one at the same, around the same time?
A. I gave him another one in January of 2005.
Q. Okay. Why did you send this e-mail to Gary Crawford in June 2004?
A. Gary sent the original e-mail on June 29th. On June 29th, saying that DKO may file a claim, and I believe this was after Cicatrix had filed their claim at which time I had told Gary not to take any action. So I again sent this e-mail telling him not to take any actions on any claims.
Q. And were there any additional reasons why you were instructing him not to take any actions on any claims in June 2004 versus the earlier instruction that you gave him?
A. Because in, like I said, I don't remember the month of the Cicatrix claim, but Gary took action without notifying the agency that he had the claim and was taking action.

Page 32

Q. Is that why you -- did that happen before or after you sent the memo dated March 24th, 2004 in Exhibit 3?
A. I don't remember the date of that claim.
(Thomas Exhibit No. 6 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you a document that's been marked Exhibit 6 consisting of four pages. The first of which is a letter dated December 9th 2004. Have you seen this document before?
A. This is not the exact document I saw. The one I saw was not signed.
Q. Is that the FLRA mail distribution center stamp that appears on the document?
A. Yes.
Q. And does that stamp indicate that it was received on December 13th, 2004?
A. Yes.
(Thomas Exhibit No. 7 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you a document marked Exhibit 7, which is also a four-page

Page 33

document, the first page of which is a letter dated December 9th, 2004. Have you seen this document before?
A. Again, this is not the document I saw. It was not signed.
Q. And is that the FLRA mail distribution center stamp that appears on this one?
A. Yes.
Q. And does the stamp indicate that it was received on December 13th, 2004?
A. Yes.
Q. And you say you received a different version of this document?
A. Yes.
Q. Let me step back one second. Exhibit 6 and 7, do you understand those documents to be the claims submitted by DKO Technologies?
A. It was not signed. The documents I saw were not signed.
Q. And where did you obtain the documents that you saw?
A. From Gary Crawford.
Q. And do you know where he obtained them from?
A. From DKO.

Page 34

Q. Do you know if they were faxed to him from DKO?
A. That's what he told me, they were faxed.
Q. And the documents that you received from Gary Crawford, were those claims by DKO Technologies?
A. Yes.
Q. And when did you first learn of those claims?
A. On January 10th, 2005.
Q. You hadn't learned of the claims before then?
A. No.
(Thomas Exhibit No. 8 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you a one-page document marked as Exhibit 8, a memorandum dated December 30th, 2004 bearing Bates stamp number P 0180. Did you receive this memorandum from Gary Crawford?
A. No.
Q. Have you ever seen this document before?
A. No.
(Thomas Exhibit No. 9 was marked for identification.)

Page 35

BY MR. KNASEL:
Q. You instructed Gary Crawford not to communicate directly with David Smith?
A. Not to communicate directly with David Smith? About what?
Q. About anything.
A. No.
Q. Did you direct Gary Crawford to send communications through you to David Smith?
A. About what?
Q. About contractor claims?
A. I don't remember.
Q. Did you issue any instructions to Gary Crawford regarding any other communications directed to David Smith?
A. I don't remember.
Q. The court reporter has handed you what's been marked as Exhibit 9. Entitled in part Proposed COFD bearing Bates numbers P 0182 through P 0202. Have you ever seen this document before?
A. Yes.
Q. And when did you see this document?
A. In late summer of 2005, early fall.
Q. And what was the circumstances surrounding your coming into contact with this document?

Page 36

A. May I speak to my lawyer?
(Witness confers with counsel.)
THE WITNESS: It was provided to me by counsel.
BY MR. KNASEL:
Q. Prior to that time, have you ever seen this document?
A. No.
(Thomas Exhibit No. 10 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you a document marked as Exhibit 10 bearing Bates stamp numbers P 0205 through P 226. Have you seen this document before?
A. Yes.
Q. And what is this document?
A. It is, it looks like a contracting officer's decision.
Q. And who prepared it?
A. Gary Crawford.
Q. And when was this document provided to you?
A. It was not provided to me. I saw it. Counsel showed it to me in late summer, early fall of

Page 37

2005.
Q. Prior to that time, had you seen this document?
A. No.
Q. Have you been made aware of its existence?
A. No.
Q. Did Gary Crawford ever tell you that he had ever issued a final decision regarding the DKO Technologies claim?
A. Absolutely not.
Q. You said that you first learned of the claim submitted by DKO Technologies to the FLRA January 10th, 2005, correct?
A. Correct.
Q. What did you do upon learning of those claims?
A. I asked Gary, I asked him not to take any actions whatsoever, and I spoke with my supervisor, David Smith.
Q. Why did you ask him not to take any actions whatsoever?
A. At that time, I felt like Gary, the trust we had in him as a contracting officer was no longer there.
Q. Why not?

Page 38

A. Gary was performing actions without notifying the office of what he was doing. Some of the advice that Gary was giving was improper on contracting matters.
Q. What was Mr. Crawford doing without notifying the agency?
A. What was he what now?
Q. What did he do? You said he did things without notifying the agency, so I want to know what things he did without notifying the agency?
A. Such as on the Cicatrix he started action on the claim before notifying the agency that he had the claim. He received this claim in December, didn't tell agency he had received it.
Q. Anything else?
A. Those things. No. That's fine.
Q. How did you find out that the claims had been submitted?
A. Gary notified me. Said that they had been submitted.
Q. How did he notify you?
A. First time he came to my office and notified me verbally.
Q. And that was on the 10th of January 2005?
A. Yes.

Page 39

Q. Do you know why he came to your office to notify you then?
A. Gary and I talked.
Q. So as far as you know that conversation wasn't in response to any order from you?
A. I would hope it was in response to an order from me.
Q. Meaning your prior orders to him to notify you of any claims?
A. Yes.
Q. What did you tell Gary Crawford in that conversation?
A. I don't remember.
Q. You mentioned that you discussed it with David Smith. What did you discuss with Mr. Smith?
A. That --
MR. D'ALESSANDRIS: Can we have a moment to consult on possible privilege? We are a little over an hour. Do you want to take a short break now?
MR. KNASEL: Sure. That would be fine.
(Recess.)
MR. KNASEL: Could you repeat the last question, please.
THE REPORTER: "Question: You mentioned that you discussed it with David Smith. What did you discuss with Mr. Smith?"

Page 40

THE WITNESS: I let Mr. Smith know that a claim had been received.
BY MR. KNASEL:
Q. And did you discuss anything else with him?
A. David and I discussed the handling of the claim.
Q. And what did you discuss about handling the claim?
A. Whether Mr. Crawford should handle the claim or whether we should send it elsewhere.
Q. And did you have any recommendations from Mr. Smith about that?
A. Yes. That the claim be sent to Bureau of Public Debt.
Q. And you've mentioned the Bureau of Public Debt before and just so we are all clear, when you refer to the Bureau of Public Debt, are you referring to a bureau within the U.S. Treasury Department?
A. Yes.
Q. And why did you recommend that the claims be transferred to the Bureau of Public Debt?
A. At this time, I felt that Gary could not be objective in handling the claim.

Page 41

Q. Was there any other reasons?
A. I thought that they would render a fair decision.
Q. Meaning they, referring to the Bureau of Public Debt?
A. Yes.
Q. Why did you think Gary Crawford couldn't render a fair decision?
A. There were several reasons, but I felt that at this time, Gary would have done anything for this contract, as he said to another employee, supervisor.
Q. Who did he say that to?
A. Rita Koch.
Q. And what did he say to her?
A. That he felt that the agency had done this contractor wrong and he would do anything for him.
Q. And do you know when he said that to Rita Koch?
A. I don't remember the date.
Q. Do you remember the approximate time period?
A. 2004.
Q. And when did you learn of that comment?
A. Shortly after the comment was made.

Page 42

Q. And how did you find out about it?
A. I believe Rita told me herself.
Q. Were there any other reasons why you felt that Gary Crawford could not render a fair decision?
A. At this point in time, I felt that as I said before, Gary was not objective. He was, I believe, upset with the agency and I just don't think he was objective.
Q. Aside from the comment to Rita Koch that you just testified about, was there any other reason that you based your conclusion that he would not be objective?
A. He held the claim for 30-some days before even notifying me.
Q. Any other reasons?
A. I think I said earlier that some of the trust that I had in Gary was now gone.
Q. Did you or David Smith make any decisions regarding the handling of the DKO claims? Going back to the conversation you mentioned that you had with him.
A. Yes. I think I just said that, we said it would be sent down to BPD.
Q. And who made the decision to send it to the Bureau of Public Debt?

Page 43

A. It was a joint decision. My supervisor and I.
Q. And was that decision made for the reasons you just testified about?
A. I can only speak for myself.
Q. As far as yourself?
A. Yes.
Q. Did you discuss any of those issues with Gary Crawford before making your decision?
A. Why I was sending it down to BPD?
Q. Yes.
A. I don't remember, but I don't think so.
Q. Did you discuss the transfer of the DKO claims to the Bureau of Public Debt after the decision was made with Gary Crawford?
A. I did not discuss it with Gary.
Q. If you go back and look at Exhibit 5. Which is a series of e-mails. We talked earlier about the one from you to Gary Crawford dated June 30th, 2004. And if you look above that one towards the bottom of the first page, do you see an e-mail from Gary Crawford to you dated January 10th, 2005?
A. The one where he says pursuant?
Q. Yes.
A. Yes.

Page 44

Q. Do you recall receiving that e-mail from Gary Crawford?
A. Yes.
Q. And did you receive this e-mail after the conversation you had with Gary Crawford on January 10th, 2005 that you had previously testified about?
A. Yes.
Q. Did you instruct Gary Crawford to give you written notice of the DKO claims?
A. Yes.
Q. And did this e-mail constitute that written notice?
A. Yes.
Q. If you look above that e-mail, there is a reply e-mail from you to Gary Crawford on the same day. Did you send that e-mail to Gary Crawford?
A. The one where it says did you receive a copy?
Q. Yes.
A. Yes.
Q. Okay. And in that e-mail you ask Gary Crawford to provide you with a copy of the DKO claim, correct?
A. Yes.
Q. Did Gary Crawford provide you with a copy

Page 45

of the DKO claims?
A. Yes.
Q. Do you recall when he provided you with that?
A. I don't remember the exact time.
Q. If you will keep going up on the e-mails, the next one up is from Gary Crawford to you dated January 10th, 2005 and says please note that a hard copy of both claims has been provided as requested. Did Gary Crawford provide you with a hard copy of both DKO claims on January 10th, 2005?
A. Yes.
Q. And did you receive that e-mail from Gary Crawford?
A. Yes.
Q. And if you look above that, there is another e-mail from you to Gary Crawford dated January 10th, 2005 responding to the previous e-mail. Did you send that e-mail to Gary Crawford?
A. Yes.
Q. And do you see where it says please provide me with an electronic copy?
A. Yes.
Q. Why did you want Gary Crawford to provide you with an electronic copy?

Page 54

A. Adjudicating the claim.
Q. And did David Smith ask you to contact BPD?
A. Yes.
Q. And just to clarify, BPD is the Bureau of Public Debt?
A. Yes.
Q. And did you do so?
A. Yes. I did.
Q. And what did you learn from BPD?
A. That they could handle it. That they could adjudicate the claim.
Q. And did any arrangement need to be made with regard to payment for that service?
A. I believe the funding was already there at BPD.
Q. Did the FLRA have a pre-existing agreement with BPD?
A. Yes.
Q. And if you look at the next paragraph that begins regarding BPD's costs. Yvonne and I are exploring one option. Can you explain what this option refers to?
A. Refers to agreement that we had with Bureau of Public Debt to do some solicitations for

Page 55

contracts for us.
Q. In order for BPD to adjudicate the DKO claims, was it necessary to modify the agreement?
A. Yes.
Q. Between the FLRA and BPD?
A. Yes.
Q. Could you mark that as the next exhibit, please.
(Thomas Exhibit No. 13 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you a document that's been marked as Exhibit 13 bearing Bates stamp number GOV-03974 and containing an e-mail from Yvonne Thomas to David Smith dated January 13th, 2005 regarding BPD agreement. Did you send that e-mail to David Smith?
A. Yes.
Q. And the first sentence where it says BPD is going to modify the agreement showing that we are using $10,000 for CO services for the claim. Is that referring to the modification that you just testified about?
A. Yes.
Q. And the claim refers to the DKO

Page 56

Technologies claims?
A. Yes.
Q. And then do you see where the e-mail continues: Therefore the only thing I need to send them is an e-mail indicating that they should move forward with the modification. I plan to do that within the next 10 minutes and will send the package off to them tonight. Do you see that?
A. Yes.
Q. Did you send an e-mail to that effect to BPD?
A. Yes.
Q. And in the last sentence, what does the package refer to?
A. Copies of the contract file.
Q. And did you send that to BPD?
A. Yes.
Q. Do you know when BPD received that?
A. The next day.
(Thomas Exhibit No. 14 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you a document marked as Exhibit 14 entitled Reimbursable Services Agreement bearing Bates stamp numbers

Page 57

GOV-04597 through GOV-04602. Can you identify this document for me, please?
A. This is an amendment to the BPD agreement.
Q. And is this the modification that you were just talking about?
A. Yes.
Q. And when was this amendment signed?
A. On 1-26-2005.
(Thomas Exhibit No. 15 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you what's been marked as Exhibit 15, a one-page letter dated January 14th, 2005 bearing Bates stamp P 0009. Do you recognize this letter?
A. Yes.
Q. Did you prepare this letter?
A. Yes.
Q. Did you send this letter to DKO Technologies?
A. Yes.
Q. Why did you prepare this letter?
A. To notify DKO that the contracting officer had been changed.
Q. In the second sentence of the letter, why

Page 62

ordering him to suspend all action on this claim?
A. I did not.
Q. Did anyone else?
A. I don't remember.
Q. Looking back at Exhibit 16, the January 13th e-mail from Gary Crawford to Yvonne Thomas. Did you do anything in response to this e-mail after receiving it?
A. I believe I instructed Gary not to take any action.
Q. Did you do anything else?
A. I don't remember.
Q. Did you discuss Gary's e-mail with anyone else?
A. I don't remember.
Q. And Exhibit 17, what did you do in response to receiving this e-mail from Gary Crawford?
A. I don't believe I did anything.
Q. Did you discuss this e-mail with anyone else?
A. I don't remember.
(Thomas Exhibit No. 18 was marked for identification.)
BY MR. KNASEL:
Q. The court reporter has handed you a

Page 63

document marked as Exhibit 18, a one-page letter to Yvonne Thomas from DKO Technologies bearing Bates stamp P 0065. Do you recognize this document?
A. Yes.
Q. Did you receive this letter from DKO?
A. Yes.
Q. When did you receive this letter?
A. I don't remember.
Q. Did you take any action in response to receiving this letter?
A. I don't remember.
Q. Did you discuss this letter with anyone?
A. I believe I discussed it with my supervisor.
Q. And your supervisor is?
A. David Smith.
Q. Did you discuss it with anyone else?
A. I don't remember.
Q. Did you provide a copy of this letter to anyone?
A. I don't remember. Can we take a short break?
Q. Sure.
(Recess.)
(Thomas Exhibit No. 19 was

Page 64

marked for identification.)
BY MR. KNASEL:
Q. Ms. Thomas, the court reporter has handed you what's been marked as Exhibit 19, a one-wage document with some e-mails bearing Bates stamp GOV-04642. The e-mail at the top of the page from Tammie Johnson to Yvonne Thomas dated January 18th, 2005, did you receive that e-mail?
A. Yes.
Q. And who is Tammie Johnson?
A. She is our contracting officer at the Bureau of Public Debt.
Q. And what is this e-mail in reference to?
A. Tammie assigning a contracting officer to the claim.
Q. The DKO Technologies claims?
A. Yes.
Q. And who was the contracting officer assigned?
A. Linda Pryor.
Q. And below that there is an e-mail to Linda Pryor apparently dated January 14th, 2005. From Yvonne Thomas. Do you see that one?
A. Yes.
Q. What is that e-mail in reference to?

Page 65

A. E-mail to the contracting officer assigned to the case letting her know that we did have a time frame we needed to meet.
Q. Okay. And that was less than 30 days to respond to the claimant?
A. Yes.
Q. And did you send that e-mail on January 14th?
A. Yes.
Q. Why on January 14th did you believe you had less than 30 days to respond to the claimant?
A. Because the claim was received in December.
Q. How long from the time the claim was received does the contracting officer have to issue a decision on a claim?
A. I believe it's 60 days.
Q. If the DKO claims were received on December 17th as you previously testified, wouldn't there be more than 30 days left to respond to the claimant?
A. I don't know.
Q. Can you mark that as the next exhibit, please.
(Thomas Exhibit No. 20 was