arc administrative resource center

# REIMBURSABLE SERVICES AGREEMENT

ARC Agreement No. 2051IA04-098
Modification No. 1

This agreement is entered on behalf of the Treasury Franchise Fund, Administrative Resource Center (Providing Agency), and the following Customer Agency, under the authority of Treasury Department Appropriations Act, 1997 P.L. 104-208, as amended.

Customer Agency: **Federal Labor Relations Authority**
**1400 K Street, NW**
**Suite 200**
**Washington, DC 20424**

| | (Name) | (Phone) | (FAX) |
|---|---|---|---|
| Primary Contact: | **Yvonne Thomas** | **(202) 218-7764** | **(202) 343-1066** |
| Secondary Contact: | **David Smith** | **(202) 218-7907** | **(202) 343-1007** |

Customer Agency ALC: **5400-0001** FACTS ID: ______ Customer Order No. ______
Customer DUNS: **096358148**

Services to be Provided: **Contract Administration Services**
**Modification #1: Additional Contract Administration Services Description for Evaluating and Adjudicating Two Contractor Claims. There is no monetary change to agreement.**

Period Covered: 9/3/2004 to 9/2/2005 Estimated Costs: **$38,500.00**

Payment Provisions: **One Time Cost** **Via IPAC**

APPROVALS

| PROVIDING AGENCY | CUSTOMER AGENCY |
|---|---|
| Michelle Slonak for (Signature) | (Signature – Financial Manager) |
| **Frederick A. Phillips** (Typed Name) 1/26/05 (Date) | (Typed Name) (Date) |
| **Deputy Executive Director** (Title) | (Title) |
| TREASURY FRANCHISE FUND<br>ADMINISTRATIVE RESOURCE CENTER<br>FRANCHISE SERVICES<br>200 THIRD STREET<br>PARKERSBURG WV 26106 | David M Smith (Signature – Program Official) |
| PHONE: (304) 480-7227 FAX: (304) 480-7161 | DAVID M SMITH (Typed Name) 1/26/05 (Date) |
| FACTS ID: 2045<br>ALC: 20-55-0861<br>TREASURY APPROPRIATION FUND SYMBOL:<br>20X4560.010<br>DUNS: 126520464 | ACT'G EXEC DIRECTOR (Title) |

EXHIBIT Thomas 14 PENGAD 800-631-6989

GOV-04597

# MEMORANDUM OF UNDERSTANDING

BETWEEN

| Treasury Franchise Fund Administrative Resource Center | & | Federal Labor Relations Authority (FLRA) |
| --- | --- | --- |

**Background**

The purpose of this Agreement is to document the understanding of services to be provided to the customer agency by the Treasury Franchise Fund's Administrative Resource Center (ARC) and set forth the fees to be paid to ARC for such services. This agreement authorizes the recovery of all costs incurred by ARC in providing services to the customer agency. Pursuant to the authority of the Government Management Reform Act of 1994, the parties specified above agree that administrative services will be provided in accordance with the following terms and conditions:

1. **Services to be Provided**
   ARC will provide, directly, through another federal agency or through a contractual relationship, the services described in this Memorandum Of Understanding and attached documentation (if applicable). The services descriptions incorporated into this MOU are general summaries. Specific processes will be resolved at the appropriate staff level. Ad hoc services may be requested verbally or in writing. Fees for such services will be charged to the customer during the normal billing cycle.

2. **Reimbursement for Services**
   ARC will charge for services rendered based on actual direct and indirect costs of providing services in accordance with the cost schedule attached to the Reimbursable Services Agreement. A new Reimbursable Services Agreement form and cost schedule will be prepared and approved by ARC and the customer entity prior to the beginning of each annual service period.

3. **Method for Bill Processing**
   The customer agency will be billed electronically in accordance with the cost and billing schedule. A billing statement will be provided in conjunction with the electronic collection.

4. **Termination**
   If ARC decides to discontinue a line of service, at least 90 days written notice shall be given to the customer agency. If the customer agency decides to terminate use of a line of service with ARC, 90 days written notice shall be given to the Executive Director, Administrative Resource Center.

5. **Term of Agreement**
   By agreement of the parties, this agreement will remain in effect on the same terms and conditions until specific action is initiated under the provisions of paragraph 4 above or it is revised for current conditions as needed.

6. **Property**
   Non-expendable property purchased from funds supplied under this agreement shall become an asset of the agency bearing the cost of the acquisition.

7. **Pricing of Services**
   All services offered by the Treasury Franchise Fund, Administrative Resource Center, are priced using full costing methodology in accordance with OMB Circular No. A-76.

## Procurement Services Description

The Administrative Resource Center will provide procurement services to the customer agency for the following services:

Procurement Review
COOP Services
Cast Tracking System
Contract Administration services related to evaluating and adjudicating contractor claims

Files on all purchases will be maintained with documentation of the order from receipt of request from the customer closeout.

All business will be conducted in accordance with the Federal Acquisition Regulations (FAR) and Department of Treasury Acquisition Regulations (DTAR) unless specific provision for exemption applies to the customer agency.

Throughout the acquisition processes, the ARC procurement office will make the recommendations to the customer agency on the most efficient purchasing method available to obtain the needed goods or services. Staff will also be able to provide advice and assistance as needed.

The requesting office must appoint a contact within the agency to work closely with the Contracting Officer through pre-and post-award stages of the contracting process. The agency must also appoint a Contracting Officer's Technical Representative (COTR) to monitor the contract for performance and dollar limitations. The COTR is required to have formal COTR training in accordance with Treasury policies.

The ARC contracting staff will provide guidance to the customer agency throughout the acquisition process. The customer will be asked to provide documentation to initiate the contracting process. This may include, but not limited to, a statement of work, evaluation factors for award, and market research information.

The ARC contracting staff will issue the solicitation and any necessary amendments, receive proposals, provide guidance to the technical evaluation team, evaluate price (with the assistance of the customer), establish competitive ranges, negotiate, and award contracts.

Due to change in needs these actions were not awarded. Cost for solicitation services are $16,500.

## Procurement Review Services

**ARC**
Review current Procurement policies and up to 35% of the current files
Assess current Procurement policies as to whether it complies with FAR and other regulations
Assess current contract files for compliance with FAR an other Federal regulations and FLRA policies
Provide a report outlining findings and recommendations

**FLRA**
Provide FLRA policies to ARC
Provide access to contract files for review
Provide access to personnel.that need to be interviewed
Provide working space for two people at the location of the files and personnel

Reimbursement for Services
ARC will provide procurement review services up to $12,000. The fee will be collected up on issuance of the report or once services have been rendered in the amount of $12,000.

Claims services will include:

**FLRA**
Delegate to ARC, in writing, the authority to adjudicate this claim
Provide the claim and contract file
To the maximum extent possible, provide any other information that the ARC Contracting Officer deems necessary to adjudicate the claim
Accept the adjudication of the Contracting Officer

**ARC**
Review and adjudicate the claim, and prepare a written decision in accordance with the FAR

Reimbursement for Services
ARC will charge for services rendered based on the following schedule:
The price for the above adjudicating two contractor claims, $10,000, includes services provided by the Contracting Officer and Administrative Services. The fee will be collected up on the Contracting Officer's decision. The price does not include coverage of costs for unusual administrative issues or travel. Any services related to defending the decision or appeal are not covered by this agreement.

Bureau of the Public Debt
Administrative Resource Center
200 Third Street
Parkersburg, WV 26106

**Federal Labor Relations Authority (FLRA)**
**Agreement Number 2051IA04-098**
**Modification #1**

**Procurement Services:** Procurement Review, Claim Services, COOP Services, Cast Tracking System

**Administrative Fee:**

Total:

[Click here and type address]

# facsimile transmittal

| | | | |
|---|---|---|---|
| To: | Claudine Woodyard | Fax: | 304-480-7161 |
| From: | Yvonne Thomas | Date: | 2/2/2005 |
| Re: | RSA Mod | Pages: | 6 (including cover sheet) |
| CC: | | | |

☐ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

**Notes:** Signed RSA. Thanks.

pryor

**Thomas, Yvonne**

---

**From:** Tammie.Johnson@bpd.treas.gov
**Sent:** Tuesday, January 18, 2005 5:57 AM
**To:** Thomas, Yvonne
**Cc:** 'linda.pyror@bpd.treas.gov'
**Subject:** Re: FW: Claimant Notification with Contact Info

Yvonne,

I have assigned this action to Linda. Linda's phone number is 304-480-7110. Her fax is the same as mine, 304-480-7203.

Tammie

**"Thomas, Yvonne" <YThomas@flra.gov>**

01/14/2005 03:48 PM

To "'linda.pyror@bpd.treas.gov'" <linda.pyror@bpd.treas.gov>
cc "'tammie.johnson@bpd.treas.gov'" <tammie.johnson@bpd.treas.gov>
Subject FW: Claimant Notification with Contact Info

Linda,

I understand that you will be returning to the office before Tammie. I sent this claim package to Tammie on Thursday, January 13 and I am concerned that it be assigned to a CO immediately. Our clock is ticking and we have less than 30 days to respond to the claimant. If you and Tammie believe it can be completed upon her return, I am fine with that. Please advise me as soon as possible. Thanks.

Yvonne Thomas
Director, Administrative Services Division
Federal Labor Relations Authority
1400 K Street NW, Suite 200
Washington, DC 20424
202-218-7764

> -----Original Message-----
> From: Thomas, Yvonne
> Sent: Friday, January 14, 2005 8:12 AM
> To: 'Tammie.Johnson@bpd.treas.gov'
> Cc: Shewchuk, David M.
> Subject: Claimant Notification with Contact Info
>
> Tammie,
>
> Included in this letter is the contact information for Mr. Ourecky. His
> telephone number is 703-684-4656. Please let me know who the Contracting
> Officer will be as soon as possible so that I may notify him in writing.
> Thanks.
>
> <<Claim - DKO letter.doc>>
>

1/31/2005

PENGAD 800-631-6989 EXHIBIT Thomas 19 5/24/06 SR

# TAB 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - x

PHILLIP J. LAVEZZO, :

d/b/a DKO TECHNOLOGIES, :

Plaintiff, : No. 05-575C

v. :

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - x

Washington, D.C.

Wednesday, May 24, 2006

Deposition of DAVID M. SMITH, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by SUSAN L. CIMINELLI, a Notary Public in and for the District of Columbia, taken at the offices of Federal Labor Relations Authority, 1400 K Street, N.W., Washington, D.C., at 2:10 p.m., Wednesday, May 24, 2006, and the proceedings being taken down by Stenotype by SUSAN L. CIMINELLI, CRR, RPR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiff:
DAVID M. KNASEL, ESQ.
Clark & Knasel, P.C.
Market Square
108-E South Street, S.E.
Leesburg, VA 20175
(703) 443-1083

On behalf of the Defendant:
DAVID D'ALESSANDRIS, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
Room 12002
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-1011

ALSO PRESENT:
DAVID SHEWCHUK, ESQ., FLRA
WILLIAM TOBEY, ESQ., FLRA



CONTENTS


WITNESS EXAMINATION BY COUNSEL FOR
DAVID M. SMITH PLAINTIFF
By Mr. Knasel 4


EXHIBITS


D. SMITH EXHIBIT PAGE NO.
No. 28 E-mail, Bates stamp GOV-03921 38




PROCEEDINGS

Whereupon,
DAVID M. SMITH,
residing at 3867 Barcroft Lane, Alexandria, VA, was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. KNASEL:

Q. Mr. Smith, please state your full name for the record, please?
A. David Michael Smith.
Q. And what is your current address?
A. 3867 Barcroft Lane, Alexandria, Virginia, 22312.
Q. Are you currently employed?
A. I'm not.
Q. When were you last employed?
A. I retired from the FLRA in September of 2005.
Q. And at the time that you retired, what was your position?
A. I was the solicitor and the acting executive director.
Q. And how long had you held that position?



A. I had been the solicitor for 13 years and I had been the acting executive director for I believe two and a half years. I'm not certain. It was about two and a half.
Q. As solicitor, what were your responsibilities at the FLRA?
A. I'm the top, the solicitor is the top legal officer for the agency in charge of the supervision of the Office of the Solicitor. I give legal advice, handle litigation, things of that nature.
Q. And is the solicitor responsible in any way for government contracting by the FLRA?
A. The solicitor gives legal advice concerning -- the Office of Solicitor gives legal advice concerning contracting.
Q. Does the, is the Office of Solicitor responsible for handling claims made by contractors?
A. The answer to that would be no. It might be called upon to give advice, but no, not to handle them.
Q. What about as acting executive director? What were your responsibilities in that role?
A. I oversaw the Office of Executive Director, which had a number of components during my

Page 22

ever faced the situation where Mr. Crawford came to me and said I received this claim, what do you want me to do, or anything like that. I don't recall something like that happening. What we are looking for in this is notification to agency officials that we received a claim. That's what we were looking to. The next steps would have been determined after that.
Q. Did DKO ever file any claims against FLRA?
A. Is DKO the same person that's the plaintiff in this litigation?
Q. Yes.
A. Yes. They did.
Q. Do you recall when those claims were submitted?
A. My recollection is the claims came in either the end of 2004 or the beginning of 2005.
Q. When did you first learn of the claims?
A. Several weeks after they were actually filed.
Q. How did you first learn of them?
A. My recollection is Miss Thomas informed me that Mr. Crawford had informed her the claims had been filed.
Q. What did you do upon learning of the

Page 23

claims?
A. Discussed it with Miss Thomas and either, on my own or through her, directed Mr. Crawford not to take any action until we assess the situation.
Q. After that, did you take any further steps with regard to those claims?
A. Yes. Those claims were eventually handed over or farmed out to a contracting officer with another agency of the government where we employed their contracting officer to handle the disputed claims.
Q. And was that other agency the U.S. Treasury Department Bureau of Public Debt?
A. That's my recollection. Yes.
Q. Please take a look at what was previously marked as Exhibit 8. Do you recall receiving this memorandum?
A. No. I do not.
Q. Do you know whether or not Yvonne Thomas received this memorandum?
A. If she did, she did not inform me that she received it. In fact all of our conversations would indicate she had the same message.
Q. Was Gary Crawford instructed to direct communications to you through Yvonne Thomas?

Page 24

A. No.
Q. Please take a look at what was previously marked as Exhibit 9. And after you've had a moment to review it, can you tell me if you've ever seen this document before?
A. No. I have not.
Q. Who is Thelma Brown?
A. Thelma Brown is a paralegal who works at the Office of the Solicitor.
Q. And is she a Notary Public?
A. Yes.
Q. Please take a look at what was previously marked as Exhibit 10. And once you've had an opportunity to review that document, please tell me if you've seen it before.
A. I believe I have seen this before.
Q. And when did you see that?
A. I believe it was attached to a litigation document that came in to the FLRA Office of the Solicitor in I would say probably the spring or summer of 2005.
Q. Prior to that time, had you ever seen this document?
A. No.
Q. Do you know if you ever received it prior

Page 25

to that time?
A. I did not.
Q. Do you know if anyone else in the FLRA had received this document prior to the litigation that you referred to?
A. If they did, they did not convey it to me so -- again, I don't know what someone else could have received.
Q. And going back to Exhibit 9, do you know if you ever received that document?
A. No. I did not receive proposed COFD.
Q. Do you know if anyone else in the FLRA ever received that document?
A. I do not. Although if they did, they never conveyed it to me.
Q. Were the DKO claims referred to the Bureau of Public Debt?
A. Yes.
Q. Why was that done?
A. We were not willing to let Mr. Crawford handle this matter because of his history and because of the way he dealt with the claim when it was filed by DKO.
Q. What do you mean by his history?
A. Well, I've already relayed to you it could

Page 26

be the history involving some other matters. And the DKO claim was filed, we had given him instruction as you already noted to inform us about it immediately, take no action. He did not do so when the claim was filed. He delayed for a period of several weeks, two to three as I recall, informing Miss Thomas that DKO had in fact filed a claim.
Q. Is there any other history that you haven't already described that was relevant to that decision?
A. I'm sure there is. Mr. Crawford had by that time engaged in behavior that caused me to question his neutrality and his ability to fairly adjudicate the claim. I might not be able to recall every incident here today.
Q. Well, can you give me those examples that you can recall?
A. I recall a conversation he had with a person when I was not in the room where he referred to the Cicatrix claim stating that he felt they had not been treated as fairly as they should have been. If he had a chance, if they ever filed a claim, he would try to get the agency, get the FLRA -- I think that was Cicatrix, but I'm not certain. But to hear comments like that from a contracting officer was

Page 27

alarming and would make me think very carefully before I would allow them to adjudicate a claim. There may have been others.
Q. What happened after the DKO claims were transferred to the Bureau of Public Debt?
A. The -- I don't have a specific recollection. I know the claims ultimately did not result by review of the public debt people. I'm not familiar with exactly what went on between the claimant and the contracting officer but the bureau probably denied the claims. Once we transferred the claims, we took no action in either the Cicatrix or DKO claim, either the adjudication of it or the merits. We totally turned that over to Public Debt.
Q. Did the Bureau of Public Debt issue a decision?
A. My recollection is they did.
Q. Were you aware that Gary Crawford had already issued a decision at that time?
A. I was not.
MR. D'ALESSANDRIS: Objection. Assumes facts not in evidence.
BY MR. KNASEL:
Q. Did you ever become aware that Gary Crawford had issued a decision?

Page 28

A. I became aware when I saw the litigation that came into the Office of the Solicitor in the spring or summer of 2005 that there was a purported decision attached to the claim and that's Exhibit 10. That's the first time I became aware of anything like that.
Q. And just so we are clear, the litigation you're referring to is DKO Technologies vs. The United States in the Court of Federal Claims?
A. That's my recollection. They filed an action seeking payment of the amount of money that Mr. Crawford had purportedly awarded them.
Q. Please take a look at what was previously marked as Exhibit 16. And in particular, the e-mail that appears on the bottom of the first page and the top of the second page. Do you recall ever seeing this e-mail?
A. The answer is yes but I'm not certain that all of the two pages of this e-mail were configured as they are when I saw them. I remember Mr. Crawford, the part that you referred me to, Mr. Crawford wrote an e-mail to Yvonne Thomas and this appears to be the substance of what he wrote.
And I remember that she sent him back and cc'd me, the guidance at the top. I don't have a

Page 29

recollection that the material on the second page beginning with Smith, David was attached to all of this, if that answers your question.
Q. It does.
MR. D'ALESSANDRIS: For the record, these e-mails of Mr. Smith's were printed out in sequence. You can see there is a piece of an e-mail at the top of page GOV 4535 which is apparently the last line of another e-mail, and then it's a completely different e-mail on page 4536. If you notice this was page 45 of however many pages of these e-mails at the bottom, and page 46 just started another e-mail chain.
MR. KNASEL: Understood. Thank you for that explanation.
BY MR. KNASEL:
Q. Did you do anything in response to the e-mail from Gary Crawford on Exhibit 16?
A. Well, that e-mail wasn't sent to me. It was sent to Yvonne. And if your question is did I do anything in response to the e-mail that Yvonne Thomas sent Gary Crawford on January 14th that I was cc'd on, I did not take any action after that.
Q. Did you see Gary Crawford's e-mail prior to Yvonne Thomas' e-mail of Friday, January 14th?
A. I may have.

Page 38

BY MR. KNASEL:
Q. Did Gary Crawford ever advise you that the instructions given to him to do nothing with respect to contractor claims until receiving further instructions from you or Yvonne Thomas were improper?
A. I'd say the context of the exhibits that we already looked at. I don't recall anything further than that.
Q. Can you mark that, please.
(D. Smith Exhibit No. 28 was marked for identification.)
BY MR. KNASEL:
Q. Please take a look at Exhibit 28 which the court reporter has just handed you, e-mail bearing Bates stamp GOV-03921. Do you recall receiving this e-mail?
A. Yes. I recall it.
Q. What actions, if any, did you take in response to seeing this e-mail?
A. I would have directed the co-addressee, David Shewchuk, to look into the matters that Mr. Crawford raised in this e-mail and satisfy himself and give advice concerning the propriety of the directions that we had given Gary Crawford.
Q. Did you discuss this with Yvonne Thomas?

Page 39

A. I have no recollection whether we had a follow-up discussion on top of this e-mail or not.
Q. And did you issue any further instruction or other communication to Gary Crawford in response to this?
A. Not that I recall.
Q. You stated that you had concerns about Gary Crawford's neutrality, correct?
A. Yes.
Q. Why did you not terminate Gary Crawford's contracting officer's warrant prior to his retirement?
A. The comments he made that would cause me to question his neutrality had to do with a specific contractor and the way a specific contractor was treated and how he would deal with any claims filed by that contractor. They did not go to across the board his ability to function as a contracting officer.
Q. And that contractor was Cicatrix?
A. As I recollect.
Q. When Gary Crawford retired, was an exit interview conducted with him?
A. I didn't conduct an interview with him. I can't state whether anyone else did.

Page 40

Q. Did you inspect Mr. Crawford's files prior to his departure?
A. I did not.
Q. Did you instruct anyone else to?
A. Not that I recollect.
Q. Was DKO ever offered alternative dispute resolution with respect to its claims?
A. I don't know.
Q. Are you aware that a copy of Gary Crawford's decision contained in Exhibit 10, I believe, was found in Yvonne Thomas's office at sometime after the DKO litigation commenced?
A. I am not aware of that.
Q. Do you have any knowledge as to how that document came to be in her office?
A. Well, as I stated to you in the prior question, I didn't know that the document was located in her office.
Q. Did you ever know that that document was found anywhere in FLRA?
A. To my knowledge, the document never was found anywhere in the FLRA. The first and only place that I ever saw the document was when it was attached to the litigation that was filed in the spring or summer of 2005.

Page 41

Q. I have no further questions. That should give you enough time.
MR. D'ALESSANDRIS: We have no questions. Mr. Smith, pursuant to the rules of the United States Court of Federal Claims, you're permitted to read and review the transcript of your deposition here today to ensure that it's complete and accurate. Would you like to read and sign your deposition?
THE WITNESS: I'll read and sign.
MR. KNASEL: Thank you very much.
MR. D'ALESSANDRIS: Thank you.
(Whereupon, at 3:50 p.m., the taking of the instant deposition ceased.)

____________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this ________ day of ____________________, 2006.

____________________
NOTARY PUBLIC
My Commission expires: ____________________