# TAB 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x
PHILLIP J. LAVEZZO :
d/b/a DKO TECHNOLOGIES, :
Plaintiff, : No. 05-575C
vs. : (Judge Wheeler)
THE UNITED STATES, :
Defendant. : PAGES 1 - 44
- - - - - - - - - - - - - - - - x

May 22, 2006

Washington, D.C.

Deposition of FRANCINE EICHLER, held at the Federal Labor Relations Authority, 1400 K Street, Northwest, Washington, D.C., commencing at 10:06 a.m., Monday, May 22, 2006, before Elizabeth Mingione, Notary Public.

APPEARANCES OF COUNSEL:

ON BEHALF OF THE PLAINTIFF:
DAVID M. KNASEL, ESQUIRE
CLARK & KNASEL, P.C.
108-E South Street, S.E.
Leesburg, Virginia 20175
(703) 443-1083

ON BEHALF OF THE DEFENDANT:
DAVID D'ALESSANDRIS, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
(202) 307-0139

ALSO PRESENT
David Berry
David Shewchuk
William Tobey



CONTENTS

WITNESS: FRANCINE C. EICHLER

EXAMINATION BY: PAGE
Mr. Knasel .................................. 5



DEPOSITION EXHIBITS
FRANCINE C. EICHLER


| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Memo Dated March 26, 2004, GOV-03623 | 13 |
| 2 | Memo Dated March 29, 2004, GOV-03622 | 14 |
| 3 | Personal Notes Document, GOV-03624 | 15 |
| 4 | Memo Dated April 8, 2004, GOV-03672 and GOV-03673 | 16 |
| 5 | Executive Summary Document | 18 |
| 6 | Memo Dated August 3, 2004, GOV-03667 to GOV-03671 | 21 |
| 7 | E-Mail Correspondence, GOV-03922 to GOV-03923 | 29 |
| 8 | E-Mail Dated January 11, 2005 Regarding DKO Claim | 32 |
| 9 | E-Mail Dated 1/13/05, Notice of Action | 37 |
| 10 | E-Mail Dated 1/14/05, DKO Claim | 37 |
| 11 | E-Mail Dated 1/27/05, DKO Claim | 38 |
| 12 | E-Mail Dated January 28, 2005, DKO Claim & ADR | 38 |
| 13 | E-Mail Document, GOV-02822 and 02823 | 39 |


- - -



PROCEEDINGS

Whereupon,
FRANCINE C. EICHLER,
having been first duly sworn by Elizabeth Mingione, a Notary Public within and for the District of Columbia, was examined and testified as follows:

- - -

DIRECT EXAMINATION CONDUCTED BY MR. KNASEL:

Q. Ms. Eichler, please state your name, your full name for the record.
A. Francine Carol Eichler.
Q. And what is your home address?
A. 12113 Greenway Court, Suite 301, Fairfax, Virginia, 22033.
Q. And are you a licensed attorney?
A. No.
Q. Do you have legal training?
A. Yes.
Q. And what kind of legal training do you have?
A. I had administrative legal training, and I also had criminal case training.
Q. Where did you receive that training?

Page 6

A. The Department of Defense and also, well, it's with I think it's called -- I want to say GSA. Is that the school that they have. Part of it, some courses were taken there on line.
Q. Okay. And did you receive any degree as a result of your --
A. No, I did not.
Q. -- training?
A. I did not.
Q. Okay. Well, either from your experience or from explanation your counsel has given to you, you are probably familiar with the procedures here but just for the record I will go over them briefly.
A. Okay.
Q. I will ask you a series of questions. You are required to answer them truthfully to the best of your ability. If you don't understand a question I've asked, please let me know and I'll attempt to rephrase it.
If you'd like to take a break, please let me know. And, well, I guess that covers the basics. Is that understood?
A. Yes.
Q. Ms. Eichler, how are you currently employed?

Page 7

A. I'm the Inspector General for the Federal Labor Relations Authority.
Q. And how long have you held that position?
A. Since the beginning of 1998.
Q. And what are your responsibilities in that position?
A. Well, just about everything that relates to oversight activities.
Q. Okay. Can you provide me with some examples of your responsibilities?
A. Internal reviews, evaluations, surveys, investigations, administrative investigations. If they are criminal, I turn them over to the Department of Justice. And I also am in charge of audits. However, I contract out to auditors.
Q. Do you have any responsibilities related to the lawsuit that we are here today for?
A. No.
Q. And you understand the lawsuit I'm referring to is Phillip J. Lavezzo d/b/a DKO Technologies versus the United States in the Court of Federal Claims?
A. I understand that that's the --
Q. So --
A. -- litigation claim, yeah.

Page 8

Q. So when I say the lawsuit, that's the lawsuit I'll be referring to. Okay?
A. Okay.
Q. Prior to your current position, how were you employed?
A. Prior to this position, I was the Deputy Inspector General for Intelligence at NIMA, the National Imagery Mapping Agency.
Q. And how long did you hold that position?
A. I was in that position I believe for about a year and a half.
Q. Okay. And what was your position before that?
A. I was the Inspector General for the Central Imagery Office, which with several other intelligence agencies combined into NIMA.
Q. And how long did you hold that position?
A. Four years.
Q. Are you familiar with Gary Crawford?
A. Yes.
Q. And how do you know him?
A. He was the former contracting officer of the Federal Labor Relations Authority.
Q. And how long have you known him?
A. Well, I believe I knew him from 2000 to

Page 9

2004, I believe, about four years.
Q. What's your opinion of Mr. Crawford?
A. I don't know what opinion you are asking me for, his professional opinion?
Q. Do you have an opinion as to Mr. Crawford's competence in his job?
A. I felt that he was competent.
Q. Do you have an opinion as to Mr. Crawford's truthfulness?
A. My relations and interactions with him were truthful.
Q. Are you familiar with a company called Cicatrix?
A. Yes.
Q. And how did you become familiar with that company?
A. They were one of the contractors that I investigated as part of an investigation.
Q. Okay. And when did that occur?
A. The investigation began March 2004.
Q. And when did it end?
A. August 2004.
Q. And what brought about the investigation?
A. Allegations provided to me by the former contracting officer, Crawford.

Page 10

Q. Okay. Were there allegations, complaints made by anyone else?
A. To me? No. Well, I'm sorry. There was an allegation made by Cicatrix.
Q. Okay. Was that part of your investigation?
A. No.
Q. Why not?
A. Because the -- I was in the process of investigating the contracting officer's allegations, and Cicatrix had filed a claim.
Q. Okay. And why does that --
A. I don't do investigations while there's a claim that's active.
Q. Is there a legal requirement to that effect?
A. I don't know if there's legal requirement. That's been one of my Inspector General requirements.
Q. Okay. Since that time has there ever come a time when that claim has been resolved or for any other reason you have undertaken an investigation of Cicatrix's allegations?
A. No.
Q. What were the allegations made by

Page 11

Mr. Crawford?
A. Well, his allegations were, or included complaints about the way management was treating him, the way management was handling contract claims. Also there was a security complaint related to Information Technology not being protective in regard to I guess filing contract propositions.
And there was also a complaint that was related to the improper preparation of acquisitions by management that were provided to him.
Q. And did you, were there any other allegations?
A. I think I've said.
Q. Okay. And did you investigate each of the allegations that was made?
A. Yes.
Q. What did you do to investigate those allegations?
A. Well, I went through a whole lot of material. I requested files regarding the contracts that were handled previously by the contracting officer. I had interviews with the Purchasing Officer, the Director of Administrative Services Division, the former -- there's so many positions, Acting Solicitor -- I am sorry, Solicitor Acting

Page 12

Executive Director.
Q. And that would be David Smith?
A. Um-hmm. I also had interviews with GSA and with several other agency contracting officers to see how contract claims were handled. I'm trying to think if there's any --
Q. Was there anything else that you did in investigating the allegations?
A. Of course I talked with Gary Crawford and, just trying to think --
MR. KNASEL: Okay. I neglected to do this earlier but why don't we go around and identify ourselves, starting with Department of Justice attorney?
MR. D'ALESSANDRIS: David D'Alessandris with the Department of Justice. I represent the United States.
MR. BERRY: I'm Dave Berry. I'm the Counsel to the Inspector General of the National Labor Relations Board here as Inspector General's Counsel.
AOEUFLPT: David Shewchuk, attorney, Federal Labor Relations Authority.
MR. TOBEY: William Tobey, Deputy Solicitor of LRA.

Page 13

MR. KNASEL: And I'm David Knasel, of Clark and Collins, representing the plaintiff.
Okay.
- - -
(A document was marked as Deposition Exhibit Number 1)
- - -
BY MR. KNASEL:
Q. Ms. Eichler, the court reporter has just handed you what's been marked as Exhibit 1 to your deposition. It appears to be a memorandum dated March 26, 2004 and bears Bates stamp GOV-03623. Can you identify this document for me, please?
A. This was a letter that I sent to the Chairman of FLRA, and also a copy to David Smith, the Acting Executive Director Solicitor at that time, stating that I was going to do investigation.
However, please note that there is an error there. It's not March 2006. It's March 2004.
Q. Okay. It says March 26, 2004 at the top is that --
A. Right. But, no, down in the first paragraph. There's only one paragraph.
Q. Oh, March 25?
A. Yeah, it's 2004.

Page 14

Q. Okay. And why did you send this letter?
A. Because I report to the chairman. And I do inform her when I'm doing investigations.
Q. And this relates to the allegations that you were mentioning earlier made by Mr. Crawford?
A. Made by Mr. Crawford.
Q. And is that your signature that appears there?
A. I think so.
Q. Okay.
- - -
(A document was marked as Deposition Exhibit Number 2)
- - -
BY MR. KNASEL:
Q. The court reporter has handed you what's been marked Exhibit 2, which appears to be a memorandum dated March 29, 2004, bearing Bates stamp GOV-03622. Can you identify this document for me please?
A. Yes. This was the letter that I sent to Gary Crawford affirming that I was going to do an investigation.
Q. Okay. And this relates to the same allegations you were discussing earlier?

Page 15

A. Yes.
Q. And would the same correction occur in the first paragraph, 2004?
A. Yeah, it's 2004.
Q. And is that your signature?
A. Yes.
Q. On the memo?
A. Um-hmm.
- - -
(A document was marked as Deposition Exhibit Number 3)
- - -
BY MR. KNASEL:
Q. Ms. Eichler, the court reporter has just handed you what's been marked as Exhibit 3 which bears -- a single page bearing Bates stamp GOV-03264. Can you tell me what this document is?
A. Those were my own personal notes. That was not issued to anybody.
Q. Okay. And what are they notes of?
A. They were notes of the allegations that were discussed with me from Crawford.
Q. Okay. And what did you do with this document?
A. They are put in a file with working

Page 16

papers.
Q. And when was this prepared?
A. This was prepared after I spoke with Mr. Crawford, probably in the beginning of March or middle of March.
Q. Okay. And did you use this document in the process of preparing or conducting your investigation?
A. Yes, most of it.
Q. And was this document shared with anyone else?
A. No.
Q. Does this document accurately summarize the allegations made by Mr. Crawford?
A. I have to read it again. It's been a long while.
- - -
(The witness reviews a document)
- - -
A. Yes.
- - -
(A document was marked as Deposition Exhibit Number 4)
- - -
BY MR. KNASEL:

Page 17

Q. The court reporter has just handed you what's been marked as Exhibit 4, which appears to be a two-page memo dated April 8, 2004, and bears Bates stamps GOV-03672 to GOV-03673. Could you identify that document for me, please?
A. Yes. I received a complaint from Bill Hougart, who is the contractor with Cicatrix. And this was to inform the Chairman.
Q. Okay. And is this the same complaint you referred to earlier made by Cicatrix?
A. Yes.
Q. And did you ever investigate this complaint?
A. No, I didn't. Well, I'm saying no, I didn't. I didn't investigate this for Cicatrix. I investigated some of the issues related to Crawford's allegations.
Q. Okay. And you prepared this document?
A. Yes.
Q. In the course of your investigation, did you ever prepare a report?
A. In the course of the investigation?
Q. Or as a result?
A. As a result, when the investigation was completed. Yes.

Page 18

Q. Okay. And when did you do that?
A. Well, it was in August of 2004.
- - -
(A document was marked as Deposition Exhibit Number 5)
- - -
BY MR. KNASEL:
Q. The court reporter has just handed you what's been marked as Exhibit 5, which is a document bearing Bates stamp numbers GOV-03625 through GOV-03666. And please take your time in familiarizing yourself with the document.
And once you have done that, can you identify for me what this document or these documents are?
A. Well, this is the report that was issued to the Chairman, FLRA, regarding the investigation of Crawford's allegations.
Q. Okay. And if you look at Exhibit 1, do you have Exhibit 1 in front of you? It was the March 26, 2004.
A. Um-hmm.
Q. And do you see the subject line there?
A. Um-hmm.
Q. And there's a number at the end it says,

Page 19

FLRA Inspector General Complaint 2004-I-04. What does that number refer to?
A. That refers to the investigation. And there is also a mistake here. It should have been '04 instead of '02. I'm finding all kinds of secretarial mistakes.
Q. Okay. So just to make sure I understand your testimony, you are saying on the first page of Exhibit 5, in the subject line, the complaint number should be 2004-I-04?
A. Correct.
Q. Okay. And if you look at the page marked GOV-03630, it's essentially after the Executive Summary, the sixth page of the document. At the top of the page, the subject line, should that also be --
A. That should also be '04.
Q. And, similarly, should all the -- any other reference to the complaint number for this be 2004-I-04?
A. I think so but, you know, yeah. It is '04. I'd like to double check, but --
Q. Is this a true and complete copy of your report in the investigation of Mr. Crawford's allegations?

Page 20

A. Yes. This is the report issued.
Q. What conclusions did you reach in your investigation?
A. Regarding?
Q. Regarding Mr. Crawford's allegations?
A. Well, the allegations -- the investigation revealed and -- that the things that were being done against Mr. Crawford were improper, but I could not find anything that was illegal, illegally done by management.
Q. Okay.
A. But there were improper actions.
Q. If you'd look at the top of the third page which is marked GOV-03627, third page of the Executive Summary, do you see in the first paragraph where it says, "This investigation affirmed that FLRA management intervened with the FLRA contracting officer's statutory requirement to handle contractor claims independently by directing the FLRA contracting officer to suspend the alternative dispute resolution process initiated to settle the Cicatrix claim and cease all communications with the claimant."
A. Um-hmm.
Q. Is that an example of something you found

Page 21

to be an improper action?
A. Yes.
Q. Does this report fully and accurately summarize your findings and conclusions related to the investigation of Mr. Crawford's allegations?
A. Yes.
- - -
(A document was marked as Deposition Exhibit Number 6)
- - -
BY MR. KNASEL:
Q. Ms. Eichler, the court reporter has handed you what's been marked Exhibit 6, which is a five-page memorandum dated August 3, 2004, bearing Bates stamps GOV-03667 through GOV-03671. Can you tell me what this document is?
A. Yes. Whenever I do investigations, I release a report also to the complainant, if they identify themselves, telling them what the result of the investigation was.
Q. Okay. And is this an example of that?
A. Um-hmm. (The witness nods.).
Q. Can you say "yes" or "no" --
A. Yes.
Q. -- for the court reporter?

Page 22

A. Yes.
Q. Thank you. And was this a document you prepared?
A. Yes.
Q. And you gave it to Mr. Crawford?
A. Yes.
Q. And does this summarize the results of your investigation of his allegations?
A. Yes.
Q. Okay. And if we look at the subject line, should that number there be 2004-I-04?
A. Yeah, except, well, can I request that I can double check this in my file?
MR. D'ALESSANDRIS: You should just testify to the best of your recollection.
A. Well, the best of my recollection is it's '04. There's a lot of '02 here.
Q. Okay. But just to clarify, whether it's '02 or '04, the various documents that we've looked for all relate to the same investigation?
A. Yes.
Q. Is that your signature on this document?
A. Yes.
Q. When you completed your report, what actions did you take in this investigation?

Page 23

A. What actions did I take? I released the report to the Chairman and recorded the recommendations on the list of recommendations.
Q. What's the list of recommendations?
A. I keep a list of findings and recommendations which are followed up at least two times a year to see if they have been followed up by management.
Q. Okay. If you look at the last page of Exhibit 5.
A. Is that the report?
Q. The report. There's a heading, "Recommendations", and then four points underneath. Are those the recommendations you are referring to?
A. Yes.
Q. And did you give these recommendations to the Chairman of the FLRA?
A. Yes.
Q. And did you give them to the Executive Director of the FLRA?
A. Yes. They were also provided to the Executive Director.
Q. And did you follow up?
A. Yes.
Q. And were these recommendations

Page 24

implemented?
A. No.
Q. When did you follow up?
A. I generally, well, I follow up every six months when I issue semi-annual reports to Congress.
Q. Have you followed up on these recommendations every six months since the report was issued?
A. Yes.
Q. And have they ever been implemented?
A. I have never received a response from management on these.
Q. Have you taken any other steps regarding following up on the recommendations?
A. Such as?
Q. I don't know.
A. No.
Q. Okay.
A. I don't have that authority.
Q. Have you done anything else with respect to this investigation since the time of the issuance of the report?
A. No.
Q. Are you familiar with DKO Technologies?
A. Can you clarify what you mean by am I --

Page 25

Q. Have you heard of DKO Technologies?
A. I've -- yes.
Q. And what do you understand that business to be?
A. They are a contractor that was working for the Federal Labor Relations Authority.
Q. Okay. And you aware that they filed a claim with the contracting officer?
A. Yes.
Q. And did you have any knowledge or involvement with respect to that claim?
A. No. Well, not until the financial statement audit of 2005.
Q. And what happened with the financial statement of 2005?
A. Financial statement audit, we were checking into claims to see if there were any Federal Labor Relations Authority claims that might exceed $100,000. That was part of the financial statement audit. And we were not able to get information or records that were requested by the auditor to several managers.
Q. Managers within the FLRA?
A. FLRA. Yes.
Q. What records were you looking for that

# TAB 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Donald K. Ourecky, Sole Proprietor,
D.B.A. DKO Technologies

Plaintiff

No. 05-575C
Senior Judge Smith

v.

United States of America

Defendant

## DECLARATION OF GARY W. CRAWFORD

1. This declaration is made to support plaintiff's motion to dismiss defendant's motion for continuance to obtain discovery, and to also support the plaintiff's motion for summary judgment.

2. I was contracting officer for Federal Labor Relations Authority from October 25, 2000 until April 29, 2005. The agency's official description of the position occupied by me conferred authority for agency procurement activities and programs which included: (1) significant agency-wide funding impact; (2) tasks which substantially impact mission oriented goals and objectives; and (3) levels of effort which are monitored by the FLRA procurement executive due to criticality and visibility.

3. Based upon my recognized expertise in contracting, the official position description was considered an incumbency classification, and unambiguously prescribed the following responsibilities and duties highly relevant to plaintiff's motion for summary judgment: (See: Attachment No. I)

¶ "complete authority over all phases of the contracting process, including initial planning, requirements definition, development of work statements, negotiation, execution, administration, and close-out."

¶ "planning, developing, and establishing the contractual strategy for the overall acquisition program, developing a prenegotiation position, determining the types of contracts and negotiation authority to be used, and preparing justification."

¶ "acts team leader during contract negotiations, coordinate with FLRA program managers, legal counsel, budget, and subordinate activities."

¶ "directs the full range of contract administration actions required for the acquisition program, including the issuance of contract modifications, negotiation of changes, exercise of options, investigation and resolution of contractor delays, contractor performance appraisal, <u>disposition of claims</u>, and similar matters." (Emphasis supplied.)

¶ "administers all contractual aspects of the agency-wide acquisition program; to develop innovative contractual language, terms and conditions; and to serve as program contractual authority and advisor on the acceptability and applicability of all contractual policy and procedures."

¶ "responsibility for contractual matters pertaining to the FLRA acquisition program. Supervisor is available for consultation on program objectives, budgetary constraints, and procurement policy interpretations; however, employee has unlimited authority to independently plan and carry out all contractual activities, including interpreting, extending, originating, or devising new contractual provisions, incentives, clauses, terms, and conditions."

¶ "contractual decisions and recommendations are normally accepted as authoritative, although higher level FLRA review may be necessary. Because of recognized technical expertise in contracting, however, only oral advance approval from the FLRA procurement executive is required to proceed with contractual action in cases determined critical by the employee."

¶ "authority to exercise initiative, resourcefulness, and experienced judgment in interpreting and applying such guides, as well as in developing and implementing solutions to problems that were unique, and outside the scope of current written guidelines."

4. The critical elements of my position and related duties were regularly discussed with my supervisor, and each such discussion determined that my performance was "acceptable," the highest standard under the FLRA performance system; however, the agency also twice awarded me "high-quality step increases," and the chairman of FLRA awarded me one thousand dollars ($1000) in recognition of sustained excellence in overall performance. I was promoted twice within three years. On January 16, 2004, Mrs. Thomas documented in my performance appraisal that "Gary's inter-personal relationships with his co-workers, supervisor, and external and internal customers have been satisfactory." (See Attachment No. II).

5. On December 29, 2002, following competitive negotiations, the Federal Labor Relations Authority and DKO Technologies, executed Contract No. 8095-02-035 to provide information technology services for an initial term extending January 1, 2003 through September 30, 2003. The contract provided for option years covering FY-2004, FY-2005, and FY-2006.

6. I executed the agreement for the United States of America, and designated Ronald J. Kennedy, Director, Information Resources Division, contracting officer's technical representative (COTR). Mr. Kennedy was succeeded in that role by Eunice Kuykendall, Chief Information Officer (CIO), effective 11/28/2003. The exercise of options was subject to the requirements of FAR 17.207(c). Dr. Donald K. Ourecky, sole proprietor, Vice President, DKO Technologies, executed the agreement.

7. On April 3, 2003, following competitive negotiations, FLRA and DKO executed Contract No. 8095-003-001 to provide information technology services for an initial term extending April 1, 2003 through October 30, 2003. The contract provided for option years covering FY-2004, FY-2005, FY-2006, and FY-2007.

8. On July 15, 2003, that contract was modified for $12,000.00 to provide Oracle 9i Database tasks. On December 3, 2003, the contract was again modified for $12,000 to provide additional Oracle 9i database tasks.

9. I executed the agreement for the United States of America, and designated Eunice Kuykendall, CIO, contracting officer's technical representative (COTR). The exercise of options was subject to the requirements of FAR 17.207(c). Dr. Donald K. Ourecky, sole proprietor, Vice President, DKO Technologies, executed the agreement.

10. Performance under the statements of work for both contracts commenced and continued satisfactorily; however, no work commenced under the second modification, dated December 3, 2003, because FLRA failed to deliver necessary hardware. All other tasks were timely delivered by DKO. Monthly progress reports and associated invoices were approved.

11. Disputes arose near the conclusion of the initial term for each contract when circumstances surrounding the exercise of the first option terms were contested. DKO contended that FLRA exercised its first option term under both contracts, and then wrongfully interfered with performance, suspended work, and abused official discretion. Thereafter, FLRA breached its duty of fair dealing through improper contract administration, and breached its duty of good faith through wrongful acts obstructing the claims process.

12. On June 29, 2004, following a telephone conversation with Dr. Ourecky, I wrote to David Smith, FLRA, Acting Executive Director, advising him that DKO would likely submit claims under CDA. I sought guidance from Smith, provided him a recommended ARD agreement, and requested his comments. Smith did not reply.

(See Contracting Officer's Final Decision: Exhibit J)

13. On June 30, 2004, Yvonne Thomas, my immediate supervisor, acting with Smith's knowledge, directed me regarding claims from DKO, or any other contractor, "not to take any action whatsoever including not notifying the contractor of acceptance of the claim." (Emphasis in the original).

(See Contracting Officer's Final Decision: Exhibit K).

14. I immediately objected in writing to that direction of my supervisor. Thomas orally reiterated that all claims submitted to me be promptly given to "the (FLRA) lawyers for handling."

15. I noted in my personal journal that this direction was identical to management acts challenged by me in a "Whistle Blower" complaint regarding a previous CDA proceeding. During that prior incident I had been "admonished" by David Smith to take no action on a contemplated claim, and refer it instead to the agency's chief legal officer for disposition.

16. Francine Eichler, FLRA, Inspector General, investigated that similar circumstance involving the contested handling of the other CDA action submitted to me. In that matter, Thomas similarly refused to provide a reason explaining the agency's "admonishment" to suspend settlement of a claim submitted to me. Nevertheless, Eichler's investigation revealed that certain reasons which Thomas willingly provided to the agency's senior management concerning my purported relation with the claimant were incorrect. (See: Contracting Officer's Final Decision: Exhibit L.)

17. Regarding that previous incident, based upon her five-month investigation of my "Whistle Blower" complaint, FLRA Inspector General Eichler determined that FLRA managers, including David Smith and Yvonne Thomas, had "obstructed" and"breached" that contractor's right to settle its claim under alternative disputes resolution. (See: Contracting Officer's Final Decision: Exhibit L).

18. On December 13, 2004, Dr. Ourecky, representing DKO, submitted two properly executed claims to me as the signatory contracting officer, and requested written final decisions. He agreed to consolidate both claims, and certified that statements of fact are essentially the same for the purpose of adjudication. Pursuant to my duties as contracting officer, I immediately began consideration of the claims.

19. On December 27, 2003, Yvonne Thomas orally directed me to provide copies to her of both claims submitted by DKO. I complied with her direction, but the next day Thomas physically removed from the central file room all documents relating to the claims, and secured them in her locked office. Again, I objected and made written inquiry as to reasons for such action. Thomas did not provide reasons for her actions, and she retained exclusive custody of pertinent files. Despite such provocative and unexplained acts, she now implies the contract files are incomplete due to my failed superintendency. (See: Attachment No. III).

20. On December 30, 2004, I had completed the contracting officer' final decision, and requested advice and guidance, as required by previous management directives. In direct contradiction of her sworn declaration, the contracting officer' final decision was actually transmitted by memorandum to David Smith, Acting Executive Director, through Mrs. Thomas. (See: Attachment IV.)

21. On December 30, 2004, in direct contradiction of Mrs. Thomas's sworn declaration regarding FLRA's notarial procedures, Thelma Brown, notary public, FLRA Solicitor's Office affixed her official notarial certification to my signature.

(See: Attachment V.)

22. On January 13, 2005, because I had not received comments or concurrence from Mr. Smith regarding the proposed final decision, I requested advice from a long-time colleague at another agency, an experienced contracting officer, and former supervisor. We met at his office, and discussed various issues pertaining to the disputes process. Thereafter, I executed the final decision, and requested the notary public at that agency to witness my signature. The second execution and notarial attestation were necessary because the original document notarized by the FLRA notary was never returned to me after sending it to Mr. Smith, through Yvonne Thomas. (Notarizing documents was intended to especially memorialize the timely executions in view of my imminent retirement.)

23. On January 13, 2005, I undertook several documented actions which contradict Mrs. Thomas's sworn declaration: *Mr. Crawford never notified the agency management of its [C.O.F.D.] issuance, and in the weeks following January 13, 2005, repeated represented to FLRA that no final decision had been issued."* Actually, after signing the final decision, but before mailing it to the contractor, I offered to provide Mrs. Thomas a copy of the document. She refused to "hear about it," and threatened me with "immediate suspension if it ever showed up." Whereupon, I returned to my desk and wrote her an email (with copy to the FLRA Inspector General) steadfastly promising to "put my mind to this claim, and timely render a personal final decision, as required by statute and regulation, and consistent with my responsibility to obtain advice and assistance, as appropriate. Any further delay is so unjustified that FLRA would be held to have breached its implied covenant to render a timely and appropriate decision." (I infer from my notes that the refusal to "hear about it" was a telephone conversation, not a "face-to-face" meeting).

(See Attachment No. VI).

24. On Friday, January 14, 2005, late in the afternoon, I personally deposited the contracting officer's final decision in the FLRA mailroom for "First-class postage paid delivery" to DKO Technologies, 601 Madison Street, Alexandria, VA 22314. <u>The Certificate of Service</u> was enclosed for Dr. Ourecky's signature. I had typed that document, and recall typing *January 13, 2005*, under the signature line for Dr. Ourecky. That is the date the document was prepared and typed by me, but axiomatically cannot be

the date he received it. In fact, The Certificate of Service challenged by defendant does not bear holographic notation by Dr. Ourecky verifying receipt, merely his signature above the date-line which had been already typed by me. It is incontrovertible, however, that the contractor received the final decision prior to February 14, 2005, as required. Finally, Monday, January 17, 2005, and Thursday, January 20, 2005, were Federal holidays, Washington's Birthday and Presidential Inauguration Day, respectively, and no mail was handled, further explaining the apparently ten-day long delay delivering the document to Dr. Ourecky.

(See: Attachment No. VII).

25. On January 27, 2005, I received voice-mail from a highly agitated Mrs. Thomas, who having "heard that DKO got your final decision instead of one from West Virginia" demanded to know in writing why I had mailed the document in "direct disobedience to me." She also charged that I had failed in my "duty to protect the financial interest of the agency" by awarding money to DKO Technologies. As requested, I wrote email to Mrs. Thomas with copy to the FLRA Inspector General to explain my actions

(See: Attachment No. VIII).

26. On Tuesday, April 26, 2005, Yvonne Thomas entered my private office, and closed the door. She presented a memorandum from David Smith, Acting Executive Director, terminating my contracting officer's warrant, effective immediately, in view of my retirement effective Friday, April 29, 2005. She further informed me that because I was no longer the contracting officer, I was expected "for the next few days to take care of things in the stock room." Whereupon I acknowledge laughing out loud, and stating Mr. Smith should be "bent over a bunk and stuck like a punk." Any more lurid rendition should be weighed in view of Mrs. Thomas's self-serving statement casting me as hostile toward agency management, and her other aforementioned prevarications.

(See: Attachment No. IX ).

27. I have no additional information as to whom in the agency mailroom received the invoice submitted by the contractor; however, Yvonne Thomas, Daryll Gould, Stephen Smith, and Nicole Hollis had daily access to the mailroom, and regularly time-stamped incoming mail. Furthermore, I cannot explain why an FLRA employee did not forward the invoice to the agency finance office, somebody should have done so. Internal distribution of invoices, however, is the duty of FLRA personnel, not the contractor. The invoice appears to have been duly submitted to the agency by the contractor, and received in the ordinary course of business.

28. I do not harbor hostility toward, the management of FLRA; I have never refused to assist FLRA managers in the conduct of this claim, or the subsequent law suit, but have never been asked to do so either; I have never told agency management that I did not issue the timely C.O.F.D; I steadfastly informed my supervisor that such was exactly my intention, and twice had that very action publicly notarized. I am neither seeking vengeance, nor an opportunity to "stick" David Smith.

29. Pursuant to 28 U.S.C. §1746, the foregoing information has been provided voluntarily under penalty of perjury, responding to every issue mentioned or averred in the defendant's motion for continuance, and based upon my best recollection.

Gary W. Crawford
September 6, 2005