DECLARATION OF GARY W. CRAWFORD

Attachment No. IV

Memorandum Submitting Proposed C.O.F.D.
to David Smith through Yvonne Thomas

UNITED STATES OF AMERICA
**FEDERAL LABOR RELATIONS AUTHORITY**
WASHINGTON, D.C. 20424

December 30, 2004

Memorandum

To: David Smith
Acting Executive Director

Thru: Yvonne Thomas
Director, Administrative Services

From: Gary W. Crawford
Contracting Officer

Subject: Proposed C.O.F.D.

In accordance with instructions to inform agency management of significant contracting decisions, and to seek advice, assistance, and guidance, please review the proposed final decision of the contracting officer pursuant to a claim filed under the Contract Disputes Act.

The final decision must be received by the contractor not later than February 14, 2005.

DECLARATION OF GARY W. CRAWFORD

Attachment No. V

Proposed C.O.F.D. Notarized by FLRA Notary

PROPOSED C.O.F.D.

IN THE DISPUTE PURSUANT TO 41 U.S.C. § 605(a) INVOLVING :

DKO TECHNOLOGIES
THE CLAIMANT
FLRA CONTRACT NOS. 8095-02-035 AND 8095-03-001

AND

FEDERAL LABOR RELATIONS AUTHORITY
THE AGENCY

BEFORE :

GARY W. CRAWFORD
CONTRACTING OFFICER
THE UNITED STATES OF AMERICA

I. AUTHORITY

All claims by a contractor against the Government relating to a contract must be in writing and submitted to the Contracting Officer for a decision. 41 U.S.C. § 605. Breach of contract is a cause of action relating to the subject contracts and, therefore, determined to be within the scope of the statutory disputes process. 702 F.2d. 998 (Fed. Cir. 1983); 29 Fed. Cl. 396 (1993).

II. BACKGROUND

On December 29, 2002, following competitive negotiations, the Federal Labor Relations Authority, (hereinafter FLRA), and DKO Technologies, (hereinafter the Claimant), executed Contract No. 8095-02-035 to provide information technology services for an initial term extending January 1, 2003 through September 30, 2003. The contract provided for option years covering FY-2004, FY-2005, and FY-2006.

Gary W. Crawford, Contracting Officer, executed the agreement for the United States of America, and designated Ronald J. Kennedy, Director, Information Resources Division, contracting officer's technical representative (COTR). Mr. Kennedy was succeeded in that role by Eunice Kuykendall, Chief Information Officer (CIO), effective 11/28/2003. The exercise of options was subject to the requirements of FAR 17.207(c). Dr. Donald K. Ourecky, Vice President, DKO Technologies, executed the agreement for the Claimant.

On April 3, 2003, following competitive negotiations, FLRA and the Claimant executed Contract No. 8095-003-001 to provide information technology services for an initial term extending April 1, 2003 through October 30, 2003. The contract provided for option years covering FY-2004, FY-2005, FY-2006, and FY-2007.

On July 15, 2003, the contract was modified for $12,000.00 to provide Oracle 9i Database tasks. On December 3, 2003, the contract was again modified for $12,000 to provide additional Oracle 9i database tasks. [1]

Gary W. Crawford, Contracting Officer, executed the agreement for the United States of America, and designated Eunice Kuykendall, CIO, contracting officer's technical representative (COTR). The exercise of options was subject to the requirements of FAR 17.207(c). Dr. Donald K. Ourecky, Vice President, DKO Technologies, executed the agreement for the Claimant.

Performance under the statements of work for both contracts commenced and continued satisfactorily; however, no work commenced under the second contract modification, dated December 3, 2003, because FLRA failed to deliver necessary hardware. All other tasks were timely delivered by the Claimant. Regular monthly progress reports and associated invoices were submitted by the Claimant and timely paid by FLRA.

The issues in dispute arose near the conclusion of the initial term for each contract when circumstances surrounding the exercise of the first option terms were contested. The Claimant contends that FLRA exercised its first option term under both contracts, and then wrongfully interfered with performance, suspended work, and abused official discretion. Thereafter, FLRA breached its duty of fair dealing through improper contract administration, and breached its duty of good faith through wrongful acts obstructing the claims process.

On December 13, 2004, Dr. Ourecky, representing the Claimant, submitted two properly executed claims to the Contracting Officer, and requested written final decisions. The Claimant has agreed to consolidate both claims, and certifies that statements of fact are essentially the same for the purpose of adjudication. Accordingly, this decision applies to matters in dispute relating to FLRA Contract 8095-03-001 and FLRA Contact 8095-02-035.

III. CLAIMANT'S ALLEGATIONS

¶ First

On July 6, 2003, the contracting officer orally informed DKO that all work under the contracts had been "satisfactory." He further stated "pending the likely determination the work shoul continue through next (fiscal) year" that the first options would be exercised. The contracting officer stated that input from "Kennedy and Kuykendall" (FLRA Director of Information Resources Division and FLRA CIO, respectively) would satisfy such determination. The availability of funds was not specifically mentioned, but implicitly understood as required.

Factual Areas of Agreement & Disagreement:

During two telephone conversations in late June and early July (2003) the Contracting Officer informed the Claimant that conditions for exercising the first options were favorable. The only unsettled contingency was receipt by the Contracting Officer of the necessary written verification from Eunice Kuykendall, FLRA, Chief Information Officer (CIO)and Ronald J. Kennedy, Director of IRMA (COTR) that they both supported exercising the options. It was understood that the Agency anticipated funding under a Continuing Resolution.

The "favorable conditions" referred to by the Contracting fficer concerned his authority to exercise options only after etermining that funds were available; the requirement covered the options satisfied an existing Government need; and the ercise of the options was the most advantageous method of lfilling the Government's need, price and other factor nsidered. FAR 17.207(c)(1) through (3).

econd

July 17, 2003, Eunice Kuykendall, FLRA, CIO (subsequently ), in written notice to the contracting officer, wrongfully rfered with his discretion to exercise the options by nding extra-contractual reporting requirements "to ensure we etting what we paid for" and "performance measures" to fy "what value they DKO)have added to the organization".

Factual Areas of Agreement & Disagreement:

The email cited by the Claimant is quoted out of context, and does not substantiate the assertion that CIO "wrongfully interfered with his [the Contracting Officer's ] discretion to exercise the option." Actually, the pertinent sentence in the email from CIO only reiterated her concern that quality assurance should be better documented and more systematic in future interaction with the Claimant. CIO never attempted to impose unilateral performance measures as "extra-contractual" conditions for exercising the option.

CIO unequivocally stated that work contemplated in the option year was desirable, and consistent with ongoing support for baseline operations. CIO favored exercising the option, but forcefully stated that improvement was needed in all ongoing contract administration. (Exhibit A).

On August 29, 2003, the Contracting Officer executed the required determination & Findings (D&F) authorizing the first option terms (September 1, 2003 - October 30, 2004) for Contract Nos. 8095-02-035 and 8095-03-001.(Exhibit B). The Contracting Officer forwarded electronic copies of the positive D&F to Eunice Kuykendall, Chief Information Officer; Ronald J. Kennedy, Director of Information Resource Management; and Yvonne Thomas, Director of Administrative Services, the contracting officer's immediate supervisor. (Exhibit C).

¶ Third

*On July 17, 2003, Eunice Kuykendall, FLRA, CIO, (subsequently COTR), in written notice to the contracting officer, abused discretion by demanding future control over payment of all invoices and expenditure of any funds under the contracts.*

Factual Areas of Agreement & Disagreement:

The email cited is quoted out of context by the Claimant, and does not substantiate the assertion that CIO "abused discretion by demanding future control over payment of all invoices." CIO was interacting with the Contracting Officer in her role as the agency manager responsible for overall IT strategic planning. She was not the contracting officer's representative at this time. (Kuykendall did not succeed Kennedy as COTR until November 28, 2003).

Abuse of discretion is erroneously inferred by the Claimant from fragmentary quotations extracted from one written communication between CIO and the Contacting Officer, but no evidence of breach can be adduced from any communications. (Exhibit D).

While it is legally correct that only the Contracting Officer may obligate funds under a contract, in this instance the CIO properly asserted control over the payment of invoices. Indeed, the CIO was required to personally ascertain the contractor's performance was satisfactory, and that only proper invoices were approved for payment.

¶ Fourth

*On September 29, 2003, notwithstanding the advisory notice of the positive D&F to the Contracting Officer's immediate supervisor, copies of the final D&F to the Chief Information Officer and the Director of Information Resource Management, and full compliance with regulatory certification as prescribed in FAR 17.207, the Agency's management refused to certify funds available for Fiscal Year 2004.*

Factual Areas of Agreement & Disagreement:

The D&F was properly executed based upon "the availability of funds" under a Continuing Resolution; the requirement covered by the options fulfilled an existing Government need; and the exercise of the options was the most advantageous method of fulfilling the Government's need, price and other factor considered. FAR 17.207(c)(1) through (3). The agency would be operating under a Continuing Resolution which would have funded the contract activity as an ongoing operation, not exceeding the prior year's appropriation. (Exhibit E).

¶ Fifth

*On September 30, 2003, notwithstanding written D & F from the contracting officer to exercise the first twelve-month option, Contract No. 8095-02-035 was extended for a shorter term ending November 30, 2003. An obligation of $18,645.00 was executed. On the same date, notwithstanding a written D& F from the contracting officer to exercise the first twelve-month option, Contract No. 8095-03-001 was extended for a shorter term ending January 30, 2004. Stephen G. Smith, contracting officer, executed an obligation of $87.360.00.*

Factual Areas of Agreement & Disagreement:

No oral or written explanation was given to the Claimant by FLRA to explain why the agency refused to fund the entire option year. FLRA stated only that the Claimant was required to "extend performance" under both contracts at rates provided in the base fiscal year (2003). The contracts were modified to extend the term to November 30, 2003. (Exhibit F).

¶ Sixth

*On November 12, 2003, Yvonne Thomas, Director of Administrative Services, improperly and without authority directed DKO to implement unilateral modifications impacting administration of both contracts, and interfering with DKO's independent management and control of its onsite personnel. (Mrs. Thomas was not the contracting officer or contracting officer's technical representative).*

Factual Areas of Agreement & Disagreement:

On November 12, 2003, Yvonne Thomas, Director of Administrative Services, in writing directed the Claimant to implement unilateral modifications to certain administrative aspects of the contract concerning invoicing and payment procedures. She also directed the Claimant to take specified actions with regard to scheduling the work of its subcontractors.

Thomas informed the Claimant that the Contracting Officer would be out of the office for an extended time. The Claimant assumed the aforementioned directions from Thomas were necessitated by the Contracting Officer's absence. No further explanation was provided, no collaboration was sought, and no authority for the unilateral order was stated. Although Thomas was the Contracting Officer's immediate supervisor, she was neither a contracting officer, nor contracting officer's designated representative. (Exhibit G).

¶ Seventh

*On November 25, 2003, Eunice Kuykendall, FLRA, CIO (subsequently COTR), by written notice improperly and without authority directed the contractor "not to report to work on Monday, December 1, 2003" because Contract No. 8095-02-035 with FLRA had "ended." This notice was issued two days before the 60-day extension ended. Nevertheless, without oral or written explanation the Contracting Officer issued another extension thorough December 31, 2003, obligating an additional $9,944.00.*

Factual Areas of Agreement & Disagreement:

These events occurred while the Contracting Officer remained on extended medical absence. CIO had unsuccessfully tried to secure approval from FLRA to extend the contract for the remaining term of the fiscal year. Apparently, the decision communicated to CIO was not the same decision communicated to the Contracting Officer at his residence. While the order from CIO "not to report to work on Monday" technically exceeded her authority as COTR, the clear motive for that direction was to avoid unauthorized work.

Abuse of discretion cannot be found because CIO did, in fact, email the Contracting Officer at his residence to apprize him of the situation. The Contracting Officer's subsequent email served as clarification, or ratification, as appropriate.

¶ Eighth

*On January 30, 2004, Contract No. 8095-03-001 was extended for a term ending April 30, 2004. An obligation of $80,000.00 was executed. Gary W. Crawford, Contracting Officer, executed this extension.*

Factual Areas of Agreement & Disagreement:

As with each previous "extension" to the contract, no oral written explanation was given by FLRA to explain why the agency would not fund the entire option year. FLRA ordered the Claimant to continue performance at hourly rates provided in the base year (2003), again ignoring the higher rates agreed to in the contract for this term. The contract was modified to extend the term to April 30, 2004. (Exhibit H).

¶ Ninth

*On April 30, 2004, the Contracting Officer informed the Claimant that all work under Contract No. 8095-03-001 was suspended effective that date. This action was taken ten minutes before the end of the final day of the extension. Upon request from the Claimant, neither official explanation for suspending work, nor results of the required A-76 determination were provided.*

Factual Areas of Agreement & Disagreement:

No oral or written explanation was given by FLRA to explain why all work was abruptly suspended. In fact, FLRA did not prepare the required out-sourcing determination under OMB Circular A-76. (Exhibit I).

¶ Tenth

*June 10, 2004, the Claimant orally advised the Contracting Officer that a claim and request for alternative dispute resolution (ADR) under the Disputes Clause would be filed. FLRA senior management thereupon immediately, wrongfully, and surreptitiously acted to obstruct the timely settlement of the claim.*

Factual Areas of Agreement & Disagreement:

On June 29, 2004, following a telephone conversation with the Claimant, the Contracting Officer, in writing, informed David Smith, FLRA, Acting Executive Director, that the Claimant would likely submit claims under CDA. The Contracting Officer sought guidance from Smith, provided him a recommended ARD agreement, and invited his assistance and comments. Smith did not reply to the Contracting Officer's request for guidance. [2](Exhibit J).

On June 30, 2004, Yvonne Thomas, the Contracting Officer's immediate supervisor, clearly acting with Smith's knowledge, directed the Contracting Officer regarding claims from the Claimant, or any other contractor, "not to take any action whatsoever including not notifying the contractor of acceptance of the claim." [3] (Emphasis in the original). (Exhibit K).

The Contracting Officer immediately objected in writing to the direction of his supervisor. Thomas orally reiterated to him that all claims submitted to the Contracting Officer for settlement must be promptly given to "the (FLRA) lawyers for handling." [4]

The Contracting Officer noted in his personal journal that this direction was identical to management acts challenged by him in a previous CDA proceeding. During that incident the Contracting Officer was "admonished" to take no action on a contemplated claim, and refer it instead to the agency's chief legal officer for disposition.

At that time, the Contracting Officer filed a written complaint with FLRA Inspector General (IG). Following an investigation, the IG found, *inter alia*, that FLRA had "obstructed" and "breached" that previous Claimant's right to settle its claim under alternative disputes resolution. (Exhibit L).

On December 27, 2003, Yvonne Thomas directed the Contracting Officer to provide her copies of both claims submitted to him by the Claimant. The Contracting Officer complied. The next day Thomas removed from the central file room all other documents relating to the claims, and secured them in her locked office. The Contracting Officer objected and made written inquiry as to reasons for such action. Thomas did not provide reasons for her actions as requested by the Contracting Officer. She retained exclusive custody of the pertinent files. [5]

IV. ANALYSIS

¶ Standard of Review

Waiver of Sovereign Immunity:

The unanimous opinion in *Franconia Associates* joins the ranks of recent Supreme Court decisions such as *Winstar* and *Mobil Oil Exploration* in holding that when the United States Government chooses to do business with its citizens, it must do so under ordinary principles of law. 240 F.3d 1358. Writing for the High Court, Justice Ruth Bader Ginsburg, stated, "Once the United States waives its immunity and does business with its citizens, it does so much as a party never cloaked with immunity." A waiver of the sovereign immunity of the United States cannot be implied, but it may be "unequivocally expressed" as here when the Agency executed contracts with the Claimant. *United States v. King*, 395 U. S. 1,4 (1969). "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Mobil Oil Exploration & Producing Southeast, Inc.* v. *United States*, 530 U. S. 604, 607 (2000).

¶ Implied Duty of Good Faith and Fair Dealing

Cooperation and Good Faith:

Cooperation during contract administration is mandated by common sense and good business, but it is also a legal requirement. FLRA's right to insist upon strict contract performance and to enforce the Claimant's contractual obligations did not relive the Government from its common law duty to cooperate. Nash and Cibinic. *Administration of Government Contracts*. (pp.3).

Active Interference:

It is implicit that this contract imposed upon both parties the duty of good faith and fair dealing. This obligation extended to the performance, termination, and settlement of contract claims. FLRA's willful failure to provide alternative dispute resolution, deliberate obstruction in prosecuting the claim, and wrongful action to obstruct the dispute process violated this duty. *Restatement, Second, Contracts* 205.

Lack of Cooperation:

The Claimant's action under CDA triggered both the running of interest and the time for the Contracting Officer's final decision. Therefore it was contrary to public policy to obstruct the Claimant's statutory right to timely final decision of the Contracting Officer. FLRA had a dual responsibility to mitigate the Governments monetary liability and to respect the Claimant's right to pursue the claim. It is particularly untoward that FLRA's lack of cooperation appeared designed to keep-the Claimant uninformed of the Government's intention.

FLRA's failure to timely give notice of its intent to exercise options, or extend the term of the contracts, breached its duty to cooperate. No reasonable explanation could excuse delaying notice about performance until the last hour of the final day of the extension. Failure to cooperate is found because FLRA's egregious conduct during contract performance was unreasonable. *Hardie-Tynes Mfg. Co.*, ASBCA 20582, 76-2 BCA ¶ 11,972; Oak Cliff Realty, Inc., VABCA 3232, 91-1 BCA ¶ 23,481.

The Contracting Officer was required to make "personal and independent" judgements on the merit of the claims, but he was also entitled to the opinions and advice of technical and legal advisors in arriving at final decisions under the CDA. Nash & Cibinic, *Administration of Government Contracts* , pp. 1298-1300.

FLRA failed in its duty to advise and assist the Contracting Officer in forming his independent and personal final decision. This is most apparent in Smith's failure to comment on the Contracting Officer's recommended alternative resolution agreement. This willful failure to assist the Contracting Officer substantially impaired the Claimant's due process right to meaningful alternative dispute resolution.

Abuse of Discretion:

CIO's forceful assertion of responsibility as the agency's principle IT strategic planner may have been misapprehended by the Claimant as evidence of abused discretion. But nothing st ted or apparent in the record sustains that view.

The primary question addressed by CIO in the email dated July 17, 2003, was whether she wanted the Contracting Officer to exercise the option for continued performance. And that answer was unambiguously affirmative. The email does not document wrongful interference from the CIO with the Contracting Officer's sole discretion to take that action. It actually supports continuation of the contract, but urged improved progress reporting and quality assurance.

CIO was an active and assertive member of the Acquisition Team. But to the extent specific authority for certain actions appeared abusive or ambiguous, it must be noted that FLRA management did not always empower decision-making within her area of responsibility.

Improper Contract Administration:

It was not the duty of the Contracting Officer to defend the interests of the agency against assertions by the Claimant. Instead, he was supposed to impartially settle the dispute, and not act as the representative of either party, but as an impartial and unbiased judge. Nash & Cibinic. *Administration of Government Contracts*. pp. 1264. See also 116 Ct. Cl. 550, 89 F. Supp. 545, *aff'd,* 340 U.S. 898 (1950).

FLRA compromised the impartially of the claims process through its effort to obstruct the exclusive jurisdiction of the Contracting Officer. This unexplained act was more than a frolicsome lapse of judgment, it was troublesome breach of good faith.

The Claimant had the legal right to have its claim settled by the Contracting Officer. The United States Claims Court has declared that insistence on a decision by the original contractual official is not "hypertechnical or unrealistic."

That court also found "it may be that, in some instances, the 'reality' is that the designated individual merely rubber-stamps a subordinate's or superior's findings, but we must presume that the parties intend otherwise--that they desire that in the end he put his own mind to the problems and render his own decisions.

That has been the consistent teaching of this court in the past, and we shall not sanction an erosion of responsibility by holding that it makes no difference whether or not the chosen officer does his work." ( *New York Shipbuilding Corp. v. U. S* . 385 F.2d 427).

V. FINDINGS

¶ Implied Contract

FLRA's multiple, unilateral, extensions of work reaching five months into the first option term were prejudicial and unfair to the Claimant. The unexplained extensions required the Claimant to continue performing at an hourly rate lower than that agreed for work during this term. The uncertainty created by the multiple short-term "extensions" barred the Claimant from making alternative business decisions about using incumbent personnel to staff other opportunities. FLRA's self-serving administration of extensions, and its wrongful failure to communicate the Government's true requirements allowed the Claimant to only infer the actual status of options.

It is axiomatic that the Claimant could not discerned the agency's intention by probing the mind of its managers. But a reasonable contractual party in the ordinary course of business rightly intends the consequences of his actions. Without explanation, FLRA insisted on continued performance far into the term of the first option, but its unexplained mandate created uncertainty about the term of the agreement, which must be construed against the agency. The Claimant was effectively abandoned by its government partner in this contract, and left only with its own best guess about the agency's requirements.

This unsettled situation, wholly caused by FLRA's unwillingness to cooperate, supports the finding that an agreement covering the first option term existed between the parties as a tacit understanding. While these contract extensions did not exist by explicit agreement, they should be inferred as a matter of reason and justice. Cibinic and Nash, chap. 2, Sec. II. *Formation of Government Contracts* (3rd ed. 1998). Boyd, *Implied-in-Fact Contract: Contract Recovery Against Government Without Express Agreement*, 21 Pub. Con. L.J.84 (1991).

¶ Improper Suspension of Work

Beginning with negotiation of the original agreement, and through final close-out of the resulting contract, both parties were bound by the implied covenant of good faith and fair dealing. *Hughes Communications Galaxy, Inc. v. United States*, 26 Cl Ct. 123, 140 (1992). *Solar Turbines, Inc. v. United States*, 23 Cl. Ct. 142, 156 (1991).

An unique responsibility, however, devolved upon FLRA because it possessed sole discretion to exercise the options with the Claimant, thus determining the term of performance. In view of that unilateral power, the covenant of good faith and fair dealing mandated that the exercise of such discretion be reasonable. *Boone v. Kerr-McGee Oil Industries*, 217 F. 2d 63, (10th Cir. 1954).

FLRA's failure to regularly and candidly communicate with the acquisition team concerning work requirements was unreasonable. The abrupt unexplained termination of work without notice was arbitrary. Terminating satisfactory performance, ignoring the availability of proper budget authority, and neglecting required determinations under OMB Circular A-76 (thus breaching its duty to maximize the use of commercial activities) justify a finding of improper suspension of work.

¶ Breach of Good Faith

The court has found that a wrongful act which violates generally accepted notions of fair-dealing, decency, or reasonableness cannot be excused based upon its "bare legality". Moreover, when Government officials act improperly, a mirror image of the presumption of regularity exists. "That is, it is to be presumed that an action taken by Government officials that on its face appears irregular was taken for an improper motive." United States v. Roses, Inc. 706 F.2d 1563, 1567. (Fed. Cir. 1983).

This dispute alleges substantial injustice. The Claimant prevailed with persuasive evidence that Thomas, Director of Administrative Services, "wrongfully and surreptitiously acted to obstruct the timely conduct of the mediation and adjudication of the claim." That allegation is sustained by the facts, and the facts manifest official misconduct.

was specifically identified in
dispute. It was unethical for her
the choice of forums for settling the i
authority, obstructed the disputes proce
express intention of the contractual part
decision-making is at war with the princip
adduces the presumption of breach.[6]

¶ Contract Administration

Contract administration empowers members of the
to make decisions within areas of responsibility
selection, negotiation, and administration of co
articular, the Contracting Officer must have aut
ximum extent practical and consistent with law, on
licable of rules, regulations, and policies, on
ract. Decision-making authority and accountabili
ated to the lowest level of the acquisition syst
tent with law. FAR 1.102-4.

droit management of these contracts, however, sh
led to exercise the fundamental administrative p
to ensure that the Government's contractual need
breached its duty to foster cooperative relations
ated the essential purpose of the agreement betw
nt and the Claimant.

ent should have allowed officers of the budget a
isions to make funding decisions. Timely budget
have avoided uncertainty about the Government's
s under the contract options. FLRA should have
e consideration, consistent with hourly rates
on term. Instead, the agency inexplicably
nt's continued performance at hourly rates
pired initial term.

e the final decision of the contracting

VI. FINAL DECISION OF THE CONTRACTING OFFICER

¶ Equitable Adjustment

FLRA CONTRACT NO. 8095-02-035:

FLRA breached its duty under the contract by wrongfully suspending work during the first option term of this contract, February 1, 2004 through September 30, 2004, equaling 1360 hours at the fully burdened rate of $57.50.

The Claimant is granted an equitable adjustment at fourteen percent for General & Administrative, twelve percent for Fee, and nine percent for Overhead (Total 35%). [7]

❒ 1360 hours x $57.50 = $78,200.00 x 35% ....... $27,370.00.

FLRA CONTRACT NO. 8095-03-001:

FLRA breached its duty under the contract by wrongfully suspending work during the first option term of FLRA Contract No. 8095-03-001, May 1, 2004 through September 30, 2004, equaling 848 hours at the fully burdened rate of $169.00.

FLRA CONTRACT NO. 8095-03-001, Modification No. 002:

FLRA wrongfully repudiated its obligation under the contract by wrongfully suspending work in its entirety under Modification No. 002, dated 12/03/2003, $12,000.00.

The Claimant is granted equitable adjustment at fourteen percent for General & Administrative, twelve percent for Fee, and nine percent for Overhead (Total 35%). [7]

❒ 848 hours x $169.00 = $143,312.00 x 35% ....... $50,158.00.

❒ Modification No. 002 = $12,000.00 x 35% ....... $4,200.00.

❒ Total, plus interest from December 14, 2004,... $81,728.00.

This decision of the contracting officer is final, conclusive, and not subject to review by any forum, tribunal, or Government agency, 41 U.S.C. 605(b), unless appealed by you to the board of contract appeals, within ninety days after receipt of the decision, 41 U.S.C. 606, or to the Court of Federal Claims with twelve months following receipt of the decision, 41 U.S.C. 609(a).

12/30/2004

Gary W. Crawford
Contracting Officer
The United States of America

12/30/04

Thelma Brown
Notary Public, District of Columbia
My Commission Expires 12-14-2008

Notes

1. This second contract modification, executed December 3, 2003, provided that the Claimant would be paid $12,000 for delivering special Oracle 9i Database services. The Claimant engaged the assistance of a subcontractor deemed highly qualified by FLRA CIO. However, the tasks were never assigned solely because FLRA failed to make available the necessary hardware to commence work. This wholly caused government delay was never explained to the Claimant, despite numerous telephone calls to the contracting officer asking when the work could commence.

2. On March 12, 2003, Dale Cabannis, FLRA, Chairman, upon vacancy in the position of FLRA Executive Director, appointed David S. Smith, FLRA Solicitor, to perform those duties, presumably in an interim capacity. That decision authorized Smith to act as the agency's chief procurement executive. But as the incumbent FLRA Solicitor, he was also the agency's principle legal officer (duties which he continued to perform after being designated acting Executive Director), supervising the very attorneys who provided advice concerning any procurement actions directed by him, or by his subordinates, at his direction. Moreover, Smith simultaneously served as FLRA Ethics Officer, solidifying unbridled control over all aspects of procurement policy.

3. Thomas erred regarding the implementing regulations. The Federal Acquisition Streamlining Act (FASA), the Federal Acquisition Regulation (FAR), BCA decisions, and Claims Court judgments are unambiguous: the contractor's submission of a claim starts the running of interest, and the requirement for the contracting officer to issue a final decision within sixty days. Thomas erroneously opined that the agency may "accept" (thus, presumably "reject") claims properly submitted under CDA. Thomas's position apparently led the already disgruntled claimant to mistake her factual error to be deliberate confrontation. Moreover, Thomas's direction to the contracting officer concerning "acceptance" of the claim risked a "deem denied" result, if critical timing of the claim's receipt had been miscalculated. However, it is true that nothing prevented the contracting officer from requesting additional information concerning the claim, and nothing prevented the parties' from engaging in negotiations, and agreeing to more time, in an effort to settle the claim.

4. Thomas later orally clarified with the contracting officer that she had inferred from the FLRA Solicitor's Office that DKO's claim may not even be valid because "no payments had been refused at the time DKO submitted their letter". Whomever may have stated the principle was mistaken about the current law. *Dawco Construction, Inc. v. United States*, 930 F.2d 872 (Fed. Cir. 1991) did require contractors to first submit an invoice, and then file a claim after the Government disputed

request for payment, or failed to act on it. However, in a decision ed on July 26, 1995, *Reflectone, Incorporated v. Dalton*, the U.S. t of Appeals for the Federal Circuit held that the initial nission of a request for equitable adjustment under a federal ract qualifies as a "claim" under the Contract Disputes Act. The im must merely be a written demand seeking as a matter of right the ment of money in a sum certain. There is no requirement for a pre- sting dispute over entitlement, or the amount of the claimed. The urt specifically overruled its prior decision to the contrary in wco. The only exception is for a routine request for payment that is t in dispute when submitted. For example, if the contractor submits monthly invoice for a progress payment, that invoice is not a claim. ch an invoice can be converted to a claim only by written notice to he contracting officer, if the invoice is disputed either as to iability or amount, or is not acted upon in a reasonable time. eflectone specifically holds, however, that a request for equitable djustment is "anything but" a routine request for payment.

5. Francine Eichler, FLRA, Inspector General, investigated similar circumstances involving the contested handling of another CDA action submitted to the contracting officer. In that matter, Thomas similarly would not provide a reason to the contracting officer explaining the agency's "admonishment" to suspend alternative dispute resolution of a claim submitted to him. Eichler's investigation determined, however, that certain information which Thomas did, in fact, privately provide to the agency's senior management concerning the contracting officer was incorrect. Memorandum from Francine Eichler to Gary Crawford, July 26, 2004.

6. Joseph Schimansky, Executive Director, Federal Service Impasses Panel, evaluated ~~testimony during the conduct of an unrelated formal~~ grievance filed by the contracting officer against Thomas alleging "unfair discipline." Schimansky found evidence that "Thomas's decision-making process appears to reflect a degree of unfairness." The neutral fact-finder, concluded that Thomas had disciplined the contracting officer "presumably before she had an opportunity to conduct a full investigation of all the circumstances." The fact-finder's report also established that Thomas issued a letter of reprimand without ever discussing the matter with the disciplined employee. Although that decision was "technically" permissible because FLRA policy did not require discussions, Schimansky noted that "the concept of fairness, however, involves more than mere conformance with technical requirements." In the Matter of the Grievance Involving: Gar W. Crawford and Federal Labor Relations Authority, Fact-finder's Repor of Findings and Recommendations, pp. 15. June 13, 2004.

7. General & Administrative (G&A) costs are any management, financial or other expenses incurred in the overall operation of a business. G& is expressed as a percentage of the sum of all other expenses (labor burden, direct costs, and overhead). G&A costs typically range from

to 15%. Fee is the dollar amount over and above any allowable costs paid to a contractor. Fee for a small business is typically 12%. Overhead (OH) includes all other indirect costs that cannot be applied to a specific cost category. Overhead for a small business is typically 15%. Source: United States Army Acquisition Corps. Army Contracting Agency Independent Government Cost Estimate.

Respectfully submitted,

_____/s/ David M. Knasel_____

David M. Knasel, Esq.
Clark & Collins, P.C.
Market Station
108-E South Street, S.E.
Leesburg, Virginia 20175
Telephone: (703) 443-1083
Facsimile: (703) 443-1081

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of August, 2006, a true and correct copy of the foregoing was filed electronically through the U.S. Court of Federal Claims Case Management - Electronic Case Files system. I understand that notice of this filing will be sent to all parties/counsel of record by the Court's electronic filing system and that they may access this filing through that system.

_____/s/ David M. Knasel_____